No. 37,750

THE STATE OF KANSAS, ex rel. HAROLD R. FATZER, attorney general, *Plaintiff*, v. THE BOARD OF REGENTS OF THE STATE OF KANSAS; F. M. HARRIS, chairman; WILLIS N. KELLY, JERRY E. DRISCOLL, MRS. ELIZABETH HAUGHEY, LESTER McCOY, DREW McLAUGHLIN, GROVER POOLE, DR. L. B. SPAKE, OSCAR STAUFFER, members, and HUBERT BRIGHTON, secretary, *Defendants*.

(207 P. 2d 373)

Opinion filed June 11, 1949.

*William P. Timmerman,* assistant attorney general, argued the cause, and *Harold R. Fatzer,* attorney general, was with him on the briefs for the plaintiff.

*Theo F. Varner,* of Independence, argued the cause and was on the briefs for the defendants.

The opinion of the court was delivered by

WEDELL, J.: In this proceeding the state invokes the original jurisdiction of this court in quo warranto challenging the authority of the board of regents of the state of Kansas, which exercises supervisory powers and duties over the higher educational institutions of the state by virtue of G. S. 1947 Supp. 76-108a to issue and sell bonds pursuant to chapter 435 of the Laws of 1947, in order to obtain funds for the acquisition, construction, equipment and furnishing of one or more student dormitories and facilities connected therewith upon the campus of the Kansas State College of Agriculture and Applied Science.

The state does not claim there are procedural defects in the proposed bond issue. It challenges the constitutionality of the act itself (Laws 1947, ch. 435, G. S. 1947 Supp. 76-6a13 to 76-6a25, incl.) under which the state board of regents, to be hereafter referred to as the board, proposes to issue and sell dormitory bonds.

Briefly stated, this proceeding questions the constitutionality of this legislative act whereby the board is authorized to provide, among other buildings, student dormitories on campuses of the designated schools by means of a self-liquidating plan and under which it is intended the state itself shall incur no indebtedness. In order to obtain the necessary funds without obligating the state the act authorizes the board to issue and sell dormitory revenue bonds to be paid solely and only from the revenue and income of such dormitories (§§ 1, 3, 6, 7, 8), the revenue and income therefrom being irrevocably pledged to pay the reasonable cost of operating and maintaining such buildings, the principal, interest and reserve fund requirements. (§ 9.) In the discretion of the board it may also use certain sources of revenue, other than state funds, designated in the act. (§ 3.)

The resolution of the board adopted for the intended purpose, including the form of the bond, the endorsement or covenants with the bondholders, the publication notice to all persons interested, and the proof of such publication notice as required by section 13 of the act, are appended hereto for reference and made a part hereof. The state does not contend these instruments fail to conform to pertinent provisions of the act.

The state first challenges the act on the ground it contravenes sections 6 and 7, article 11 of our state constitution which prohibits

the state from contracting a debt, except as therein provided. Those provisions read:

"For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debts; but such debts shall never, in the aggregate, exceed one million dollars, except as hereinafter provided. Every such debt shall be authorized by law for some purpose specified therein, and the vote of a majority of all the members elected to each house, to be taken by the yeas and nays, shall be necessary to the passage of such law; and every such law shall provide for levying an annual tax sufficient to pay the annual interest of such debt, and the principal thereof, when it shall become due; and shall specifically appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation shall not be repealed nor the taxes postponed or diminished, until the interest and principal of such debt shall have been wholly paid." (§ 6.)

"No debt shall be contracted by the state except as herein provided, unless the proposed law for creating such debt shall first be submitted to a direct vote of the electors of the state at some general election; and if such proposed law shall be ratified by a majority of all the votes cast at such general election, then it shall be the duty of the legislature next after such election to enact such law and create such debt, subject to all the provisions and restrictions provided in the preceding section of this article." (§ 7.)

The first question is whether the dormitory bonds constitute an indebtedness *of the state.* Section 4 of the challenged act provides:

"Revenue bonds issued hereunder shall not be an indebtedness of the state of Kansas, or of the board of regents, or of the individual members of said board, and shall not constitute an indebtedness within the meaning of any constitutional or statutory limitation upon the incurring of indebtedness." (G. S. 1947 Supp. 76-6a16.)

The resolution of the board expressly states:

". . . such buildings can and will be self-liquidating undertakings."

The endorsement on the bond plainly states the bond is a contract between the board and the holder thereof. The bond and the publication notice, in substance, clearly disclose the bond is not, and shall not become, an obligation of the state, the college, the board, or of its individual members; that it cannot be paid directly or indirectly from the proceeds of any tax levy but is payable solely and only from the revenue and income derived from the operation of a certain dormitory or dormitories and the facilities of the college; such income and revenue are irrevocably pledged to the payment of the principal and interest of such bonds.

In view of the act itself and the plain terms of the bond, a contract between the board and bond purchaser, we think no bondholder could logically contend the state, the college, the board, or

any official member or employee of the board becomes obligated to pay the indebtedness represented by the bond. The legislature by this act, as previously indicated, prohibited the state from incurring a debt under the act. The contract between the board and the bond purchaser is in express harmony with that statutory prohibition. Such an agreement between a creditor and debtor violates no rule of constitutional law. (*State, ex rel., v. Kansas City,* 140 Kan. 471, 477, 37 P. 2d 18.)

In the second place, if the debt represented by the bond technically should be designated as a debt of the state, which we think it cannot, it is nevertheless not a debt prohibited by the constitution. Debts, within the contemplation of constitutional provisions, are debts to be paid by a general property tax and not from funds to be raised in some other manner. (*State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 917-918, 28 P. 2d 770; *State, ex rel., v. Kansas City,* 140 Kan. 471, 476-477, 37 P. 2d 18; *State, ex rel., v. Kansas City,* 149 Kan. 252, 256-257, 86 P. 2d 476.) These bonds do not pledge the faith and credit of the state. They do precisely the contrary. The bondholder knows he may look only to the revenue and income from the building, or buildings, for payment. Whether he desires to make such an investment is a matter left entirely to his own discretion and judgment.

The state argues the revenue and income from the dormitories and their facilities may prove insufficient to pay the bonds and in that event a judgment against the state would be the only means of satisfying the unpaid portion of the debt. The contention erroneously assumes the validity of such a judgment, if rendered. The same contention was effectively declared to be without merit in both the first and second opinions in the case commonly known as the Kansas City municipal market case, *State, ex rel., v. Kansas City,* 148 Kan. 623, 625, 84 P. 2d 409; *State, ex rel., v. Kansas City,* 149 Kan. 252, 257-258, 86 P. 2d 476. We hold here, as we held there with respect to the liability of the city, that the instant bonds are not and cannot become a valid indebtedness of the state. Moreover, these bonds expressly provide no judgment debt arising by reason of the issuance thereof shall become a debt of the state, college, board or any individual member thereof. (Endorsement § 6.)

The state reminds us section 7 of the act (G. S. 1947 Supp., 76-6a19) provides the covenants and agreements entered into by the board for the payment of the bonds from the revenue and income

of the buildings shall be binding in all respects upon the board, its official agents, employees and its successors and shall be enforceable by appropriate action in law or equity by holders of the bonds against them. Manifestly this provision was not intended to obligate the designated parties to pay the bonds but was intended to give the bondholder redress in obtaining performance of the covenants to the end that the bonds be paid in the manner agreed upon in the event of a breach of such covenants.

We shall not unduly pursue the subject of the state's liability on the bonds. We are satisfied no such liability attaches. Some of the numerous cases holding no debt of the state, within the meaning of the same or similar constitutional provisions, is created by revenue bonds issued and sold under similar legislative enactments are *Jacobs v. Sharp*, 211 Ark. 865, 202 S. W. 2d 964; *Application of Board of Regents of University of Okla.*, 195 Okla. 641, 161 P. 2d 447; *Loomis v. Keehn*, 400 Ill. 337, 342, 80 N. E. 2d 368; *Meagher v. Commonwealth*, 305 Ky. 289, 203 S. W. 2d 35. See, also, 146 A. L. R. 328. These cited cases are presently approved only on the point no liability of the state is created under the act before us.

The state asserts, without elaboration, the act does not specifically empower the board to construct but only "to acquire" such buildings. The mere assertion is not very helpful. A careful examination of the various sections of the act convinces us the assertion is too technical.

It is true sections 2 and 3 of the act employ the words "acquire, equip and furnish" and that it would have constituted better draftsmanship to have included also the word "construct." What was the legislative intention? It certainly would constitute a strange anomaly to say the legislature intended to authorize the board, consisting of able, practical and devoted public servants, to acquire a building site, to equip a building and to furnish a building if the legislature did not intend the board should have power to first *construct* the building. What could be the object of an issue and sale of bonds if the proceeds thereof could not be used to defray costs of constructing the building?

In section 8 of the act, however, the board is expressly authorized to make all contracts and to execute all instruments "deemed necessary or advisable to provide for the *construction*, furnishing and equipment of such building, and to provide for the manner of disbursement of the funds *for such purposes.*" (Our italics.) Like-

wise section 10, the tax exemption provision, refers to any and all buildings *"erected, constructed,* or acquired hereunder." (Our italics.)

Moreover, an examination of these various provisions of the act indicates the legislature may have intended to employ the words "to furnish" as meaning "to provide" a building. It is at times used in that sense. (Webster's New International Dictionary, 2d ed.) It will be observed that in addition to authorizing the board "to acquire" a building the act authorizes it "to furnish" a building. It also authorizes the board "to equip" the building. (See §§ 3, 6.) In any event we have no doubt the legislature intended to authorize the board to *erect* or *construct* a dormitory, or dormitory buildings, and to use the proceeds from the sale of bonds to pay the cost of acquisition, erection or construction. It is the duty of courts to interpret and make effective the legislative will when reasonably possible to do so. It is elementary that in so doing courts are required to consider not one or several isolated provisions of the act, but all pertinent portions thereof in order to bring them into workable harmony. (*Rausch v. Hill,* 164 Kan. 505, 190 P. 2d 357.)

The state urges the act provides for a *permanent appropriation* of income derived from the buildings and facilities in direct violation of article 2, section 24 of our constitution, which states:

"No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years."

In the challenged act (Laws 1947, ch. 435) we are not concerned with funds which properly belong in the state treasury. Under this act funds are neither deposited in nor withdrawn from the state treasury by means of legislative appropriation or in any other manner. The constitutional provision relied on by the state does not apply to such an act. (*State, ex rel., v. State Highway Comm.,* 139 Kan. 391, 394-395, 32 P. 2d 493.)

It is well to note that with respect to the proceeds from the sale of bonds this law provides they shall be deposited in a bank, banks or other depository designated by the board and shall be used solely for the purpose for which the bonds were authorized. (§ 8.) A similar provision is contained in section 9 relative to all income and revenues derived from the operation of the building or buildings. In order to make doubly certain the constitutional provisions cited by

the state would have no application to the instant act the legislature expressly further provided as follows:

"Nothing contained in this act shall be construed as placing in the state treasury any money collected under this act or requiring such action, and the legislature hereby declares that funds deposited hereunder shall not be subject to the provision of section 24 of article 2 of the Kansas constitution." (§ 8.)

This brings us to the tax exemption provisions of the law, section 10, in which the legislature declared:

"That the revenue bonds issued hereunder and the income derived therefrom are and shall be exempt from all state, county and municipal taxation in the state of Kansas except inheritance taxes of the state of Kansas. Any and all sites acquired under the provisions of this act and any and all buildings erected, constructed or acquired hereunder shall not be subject to taxation by the state of Kansas or by any county, municipality or political subdivision therein."

The state contends this section violates section 1, article 11, of our constitution, which provides:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, except that mineral products, money, mortgages, notes and other evidence of debt may be classified and taxed uniformly as to class as the legislature may provide. All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and personal property to the amount of at least two hundred dollars for each family, shall be exempted from taxation."

We shall first consider the last part of the constitutional provision as it relates to lands and dormitories located thereon. That the land acquired and dormitories erected or constructed thereon are intended to be used exclusively for the designated state educational institutions and entirely to advance and promote their educational purpose cannot be doubted. Clearly that is the only purpose of the act. Certainly the object of the plan is neither one for private nor state profit. The evident purpose of this act was to remedy, or relieve, an acute student housing situation which had not been and, apparently in the judgment of the legislature, would not be adequately or satisfactorily met in any other way. Its manifest object was to enable students to attend such chosen institutions and to enable them to more readily acquire an education which the state, by its organic law, is duty bound to promote. Article 6, section 2, of our constitution provides:

"The legislature shall encourage the promotion of intellectual, moral, scientific and agricultural improvement, by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate and university departments."

Touching that constitutional provision this court, in *State, ex rel., v. Kemp,* 124 Kan. 716, 261 Pac. 556, declared:

"The constitution makes it mandatory upon the legislature to encourage the promotion of intellectual and moral improvement (art. 6, § 2). A specific method of encouragement is prescribed—establishment of a uniform system of common schools and schools of higher grade, embracing college and university departments. *The method is not exclusive. The legislature must do that much, but it may resort to other methods perfected in the course of social progress.* The end to be subserved by state promotion of intellectual and moral improvement is better citizenship. . . ." (p. 720.) (Our italics.)

It is common knowledge that during the early history of this nation's educational program boarding schools were common in this country. For hundreds of years dormitories and dining halls have been furnished by colleges and have been regarded as devoted to college purposes. In fact, at least in the early years of our history, the words "dormitory" and "college" were often used interchangeably. In some of them classroom work was conducted in buildings in which students slept and ate. Dormitories were exempt from taxation on the ground that necessary housing facilities were an integral part of the educational purpose. Their exemption from taxation implied a public benefit. The exemption was not intended as an act of grace on the part of the state. On the contrary the exemption was regarded as a distinct benefit to the state. The conviction was deeply grounded that sound education produces good citizenship and that the latter results in a constant increase of taxable property. These basic considerations are all chronicled in both the early and more recent decisions of the courts. A few of them are *Yale University v. New Haven,* 71 Conn. 316, 42 A. 87; *Harvard College v. Cambridge,* 175 Mass. 145, 55 N. E. 844; *Chicago v. University of Chicago,* 228 Ill. 605, 608, 81 N. E. 1138; *Cornell University v. Thorne,* 57 N. Y. S. 2d 6, 9. And this is the general modern rule with respect to exemption of dormitories constructed and maintained for student bodies under a nonprofit plan. (51 Am. Jur., Taxation, §§ 619, 622-624, incl.)

There is another principle to which we must give consideration. Even though it were concluded student dormitories are not specifically exempt from taxation under our constitutional provision pertaining to education that fact would not necessarily preclude the legislature from exempting them from taxation. Property expressly exempt from taxation by the constitution manifestly cannot be taxed. A statutory exemption, however, may be broader than the

constitutional one. (*Wheeler v. Weightman,* 96 Kan. 50, 68, 149 Pac. 977; *Gunkle v. Killingsworth,* 118 Kan. 154, 156, 233 Pac. 803; *Ryan v. State Tax Commission,* 132 Kan. 1, 4, 294 Pac. 938; *Alpha Tau Omega v. Douglas County Comm'rs,* 136 Kan. 675, 18 P. 2d 573.)

In order, however, for the legislature to extend exemptions beyond those expressly designated in the constitution, they must have a public purpose and be designed to promote the public welfare. (See cases last cited.) We have heretofore directed attention to the provision of our constitution which makes it mandatory that the legislature encourage the promotion of education. It is the legislature, and not the courts, that is charged with the duty of determining what, in its judgment, will best accomplish that purpose and thus be conducive to the public welfare.

Having concluded the exemption of this property from taxation would advance the public welfare the legislature was competent to make it. (*Ryan v. State Tax Commission,* 132 Kan. 1, 4, 294 Pac. 938.) With the wisdom of legislation touching the public interest courts have no concern. (*State, ex rel., v. Kansas City,* 140 Kan. 471, 477, 37 P. 2d 18; *State, ex rel., v. State Highway Comm.,* 163 Kan. 187, 182 P. 2d 127.) While courts may entertain different views on the subject it is not their privilege to supersede the judgment of the lawmaking body unless its judgment is entirely devoid of a rational basis. (*State, ex rel., v. Sage Stores Co.,* 157 Kan. 404, 413, 141 P. 2d 655.)

Every presumption must be indulged in favor of the validity of legislative acts. (*State, ex rel., v. Sage Stores Co.,* supra.) We think we would not be justified in striking down the exemption provision on the ground the legislature could have had no reasonable basis for believing the exemption would encourage and promote education and that its action thus would be conducive to the public interest and welfare. Further reference to this subject will be made briefly in treating the next contention.

We now reach the question whether the exemption of the revenue bonds from taxation violates the same constitutional provision (art. 11, § 1). Much of what already has been said on the subject of exempting a dormitory site and buildings acquired or constructed thereon and the wisdom of legislative policy with respect thereto applies with equal force to the exemption of the bonds from taxation. The bonds are the source of revenue for executing the plan

the legislature chose to remedy, or relieve, the student housing problem with which these educational institutions are confronted. It is hardly necessary to suggest that exemption of the site, buildings and bonds from taxation will stimulate their ready sale and thus promote a more speedy realization of this aspect of the state's educational program.

Although constitutional provisions of the respective states vary somewhat, the decisions and opinions of courts sustaining the constitutional validity of similar acts, enacted for various purposes, which exempt revenue bonds from taxation are helpful in principle. They are cited for such limited purpose and only as they relate to the subject of exemption of bonds from taxation. Their citation must not be construed as a ruling that this state may engage in the particular ventures therein involved. (*Bates v. State Bridge Co.*, 109 W. Va. 186, 153 S. E. 305; *Kelley v. Earle, et al.*, 325 Pa. 337, 356, 190 A. 140; *Williams v. Samuel, et al*, 332 Pa. 265, 2 A. 2d 834; *Belovsky v. Redevelopment Authority*, 357 Pa. 329, 343-344, 54 A. 2d 277.)

It is conceivable dormitories may be constructed on the grounds of various educational institutions and that such action may lead to the exemption of considerable property from taxation. This also presents a question of public policy with which courts cannot interfere. The only question properly before us is the constitutional validity of the law under consideration with respect to the grounds on which it is challenged.

Counsel for the state further contend that by constructing and maintaining a student dormitory the state will be engaged in works of internal improvement in contravention of article 11, section 9 of the state constitution which provides:

"The state shall never be a party in carrying on any work of internal improvement except that it may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor bonds issued by the state for such highways."

Does a student dormitory constitute an "internal improvement" within the contemplated meaning of the constitution? We think it does not. The state, as a sovereign corporation, may construct a state house, courthouse, penitentiary or buildings for its penal, eleemosynary and state educational institutions. These, and others of like character, are public buildings, "public improvements," and not "internal improvements."

Our constitution expressly prohibits the state from engaging in works of internal improvement, except a system of state highways (art. 11, § 9), but section 6 of the same article just as definitely authorizes the state to contract debts for the making of "public improvements" and for the defraying of extraordinary expenses. The only limitation in section 6 is that the contracted debt shall never, in the aggregate, exceed one million dollars.

This distinction made in our constitution between "public improvements" and "internal improvements," unlike constitutional distinctions of some other states, has been clearly recognized and emphasized in our former decisions. Some of them are *State, ex rel., v. Knapp,* 99 Kan. 852, 163 Pac. 181; *State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 919, 28 P. 2d 770; *State, ex rel., v. Atherton,* 139 Kan. 197, 208, 30 P. 2d 291. These cases clearly indicate the reasoning and purpose of the framers of our constitution in making the stated distinction. History had disclosed the distressful experiences of past governments which had bankrupted themselves by engaging in "internal improvements" of various kinds and on vast scales. History also disclosed the disastrous effects of political logrolling which often accompanied such undertakings. This the framers and adopters of our constitution sought to avoid. "Public improvements," such as public buildings, were known to be essential and were expressly authorized. So in the Knapp case, *supra,* it was said:

"It needs no argument to show that *public buildings* are not internal improvements, for the former are repeatedly and clearly permitted, while the latter are as plainly prohibited." (p. 854.) (Italics supplied.)

Again in the state highway commission case, *supra,* the court declared:

"It is clear the framers of our constitution used the term 'public improvements' in section 5 as meaning something entirely distinct from what was meant by 'internal improvements' used in section 8 [now § 9], for the one was permitted, the other prohibited. Although not as full as they might be, the debates in the constitutional convention disclosed this. The term 'public improvements', used in section 5, meant *public buildings* which the state should need in carrying on its functions, such as the state house, state penal, *educational* and eleemosynary institutions (Wyandotte Constitutional Convention, p. 327), while the term 'internal improvements', used in section 8, applied to turnpikes, canals and the like. (Wyandotte Constitutional Convention, p. 329; *State v. Kelly,* 71 Kan. 811, 833, 81 Pac. 450.)" (p. 919.) (Our italics.)

See, also, annotation 14 A. L. R. 1151.

Only by reason of an existing state debt equal to the limitation contained in article 11, section 6, could it properly be contended the state itself could not *contract a debt* to build dormitories for its state colleges and universities. Here, however, as previously shown, the state is not contracting a debt and will not be liable on the bonds.

We have already indicated student dormitories long have been and now are regarded as devoted to the educational purposes of a college. Whether they are necessary, or desirable, in the promotion of an educational program and the advancement of the public welfare are matters for legislative determination. Having determined they are necessary, or desirable, for such a purpose they become a part of the "public improvements" of the educational institutions. We think no one would seriously contend buildings such as a gymnasium, auditorium, field house, student union building or a student hospital located on the campus and used by the student body do not constitute public buildings, "public improvements," or that they are not a recognized part of modern state educational institutions. (51 Am. Jur., Taxation, §§ 619, 622-624, incl.)

The case of *State, ex rel., v. Atherton,* supra, cited by the state in support of its contention that student dormitories would constitute "internal improvements" is not in point. Undoubtedly numerous "internal improvements" were contemplated under the law there in question. (See § 4 of the law there involved and opinion pp. 198, 209.) Other cases cited by the state on other contentions have been examined but found not helpful under the particular act in question. We think ch. 435, Laws 1947, is not invalid on any constitutional ground raised by the state.

The writ is denied.

HARVEY, C. J., dissents.

"RESOLUTION

"WHEREAS, The Kansas State Board of Regents determines and orders that the construction and equipment of two dormitory buildings upon the campus of the Knasas State College of Agriculture and Applied Science at Manhattan, Kansas, is necessary and desirable in order that students attending such college shall have adequate living facilities; and

"WHEREAS, It is estimated that each of said dormitory buildings will cost approximately Seven Hundred Thousand Dollars

($700,000) for construction, and the further sum of One Hundred Thousand Dollars ($100,000) for equipping each said building; and

"WHEREAS, There are immediately available sufficient funds to pay all the cost of constructing and equipping one such dormitory building with the exception that an additional sum of One Hundred Fifty Thousand Dollars ($150,000) will be needed to use in conjunction with the funds on hand for this purpose; and

"WHEREAS, It appears that this Board is duly empowered to issue Revenue Bonds pursuant to Chapter 435, Laws of 1947 (76-6a13 to 76-6a25 inclusive, General Statutes for 1947), for the purpose of obtaining funds for the construction, equipment and furnishing of dormitory buildings, and is empowered to pledge income and revenue from such buildings to be constructed and the revenues from other buildings owned and operated by said State Board of Regents and the Kansas State College of Agriculture and Applied Science, and that it appears to this Board of Regents that the issuance and sale of revenue bonds in full accordance with such statute is a proper and desirable manner of financing the construction of such buildings, and such buildings can and will be self-liquidating undertakings;

"Now, therefore,

"*Be it resolved:*

"Section 1. That Kansas State Board of Regents shall issue and there are hereby issued Dormitory Revenue Bonds Series A in the sum of One Hundred Fifty Thousand ($150,000) Dollars. Said issue shall consist of revenue bonds and shall be numbered from 1 to 150, inclusive, and shall be in denominations of One Thousand Dollars ($1,000) each. Said Dormitory Revenue Bonds shall be dated June 1, 1949, and shall bear interest at the rate of three percent (3%) per annum, payable semiannually according to the interest coupons attached thereto. Said bonds shall be numbered and shall mature consecutively each year as follows: [Here follow the bonds by number showing total annual maturities and dates thereof from June 1, 1950, to June 1, 1959, inclusive.]

"Each of said Dormitory Revenue Bonds shall be redeemable and callable prior to maturity after three (3) years from date of issue. If called and redeemed after three years from date they shall be redeemed at par plus three percent (3%). If called and redeemed after four years from date they shall be redeemed at par

plus two percent (2%), and if called and redeemed after five years from date they shall be redeemed at par plus one percent (1%), and if called and redeemed after six years from date or thereafter they shall be redeemed at par value. The Board of Regents reserves the right to call and redeem on the date of the maturity of any interest coupons any of said bonds without reference to date of maturity or serial number thereof. Such redemption shall be had by giving public notice in the Official State Paper not less than thirty (30) days prior to the date of any coupon maturity that the Board of Regents desires to redeem such Dormitory Revenue Bonds and shall specify the date of redemption, the serial number of the bonds called and the terms of the redemption. Such bonds so called shall cease to bear interest after the date fixed for the redemption thereof.

"The Dormitory Revenue Bonds issued hereunder shall be signed by the Chairman of the Kansas State Board of Regents and attested by its Secretary, and the seal of the Board affixed thereto. The coupons attached to said bonds, representing the interest maturing thereon semiannually, shall be signed by the facsimile signature of the Chairman of said Board and the facsimile signature of its Secretary. The Bonds and coupons shall be registered in the office of the State Auditor for the State of Kansas and shall be payable both as to principal and interest in the fiscal agency in the office of the State Treasurer, Topeka, Kansas, or in the office of the subfiscal agency of the State of Kansas, in the City of New York, at the election of the holder thereof.

"SEC. 2. That said Dormitory Revenue Bonds Series A when issued shall be in substantially the following form:

"FORM OF BOND
UNITED STATES OF AMERICA
No. 000

$1,000          SERIES A          $1,000
BOARD OF REGENTS OF THE STATE OF KANSAS
DORMITORY REVENUE BONDS
THE KANSAS STATE COLLEGE
OF AGRICULTURE AND APPLIED SCIENCE
MANHATTAN, KANSAS

"*Know all men by these presents,* That the board of Regents of the State of Kansas acknowledges itself to owe and for value received promises to pay out of the revenues herein described to the bearer, or if registered to the registered holder thereof, a sum of One Thousand Dollars ($1,000) on the first day of June, 195—, with

the interest thereon from date hereof at the rate of three percent (3%) per annum payable semiannually on presentation and surrender of the annexed interest coupons as they severally become due.

"Both principal and interest of this Dormitory Revenue Bond are hereby made payable in lawful money of the United States of America at the fiscal agency of the State of Kansas in the office of the State Treasurer in the city of Topeka, Kansas, or at the subfiscal agency of the State of Kansas in the city of New York in the State of New York at the option of the holder thereof.

"This Dormitory Revenue Bond is one of a series of One Hundred and Fifty (150) Dormitory Revenue Bonds, Series A, all of like date, interest rate and tenor except maturities, totalling the sum of One Hundred and Fifty Thousand Dollars ($150,000) and for whose payment, and for payment of Dormitory Revenue Bonds Series B in a total sum of Eight Hundred Thousand Dollars ($800,000) hereinafter to be issued, the revenue derived from the operation of certain dormitories, buildings and facilities of Kansas State College of Agriculture and Applied Science are irrevocably pledged.

"This Dormitory Revenue Bond is issued under the authority of and in full compliance with the Constitution and Statutes of the State of Kansas, particularly Chapter 435, Laws of 1947 (76-6a13 to 76-6a25, General Statutes Supplement of 1947), and in full accordance with the powers, duties and privileges conferred by law upon the Kansas State Board of Regents, the Kansas State College of Agriculture and Applied Science, and in full accordance with the Constitution and Laws of the State of Kansas.

"This Dormitory Revenue Bond and the series of which it is a part and the income derived therefrom are and shall be exempted from all state, county and municipal taxation in the State of Kansas, except inheritance taxes of the state of Kansas. For the prompt payment of the principal and interest hereof the State Board of Regents for themselves and for the Kansas State College of Agriculture and Applied Science have covenanted and irrevocably pledged income and revenue arising from the operation of certain dormitory buildings and facilities owned and operated by the State Board of Regents and the Kansas State College aforesaid. This Dormitory Revenue Bond is not and shall not become an obligation of the State of Kansas or of the Kansas State College of Agriculture and Applied Science or the Kansas State Board of Regents or the individual members thereof, and cannot be paid from any general property tax levied by the state of Kansas.

"*It is hereby certified and represented,* That all acts, conditions and things required to be done, to exist, happen or be performed precedent to and in the issuance of this Dormitory Revenue Band, have been done, to exist, have happened and have been performed in due time, form and manner as required by law, and that the amount of this Dormitory Revenue Bond, together with all other existing indebtedness of the Kansas State Board of Regents or the Kansas State College of Agriculture and Applied Science, does not exceed any limitation prescribed by the Constitution or Statutes of the State of Kansas.

"This bond is negotiable.

"*In witness whereof,* The Chairman of the State Board of Regents has signed this bond for and on behalf of said Board, and it has been attested by the Secretary of said Board and the seal of said Board affixed thereto, and the interest coupons hereto annexed have been signed with the facsimile signature of the Chairman and Secretary of the Kansas State Board of Regents all as of the first day of June, 1949..

-------------------------------------------
                                    Chairman.

Attest:  -------------------------------------------
                                    Secretary.

"(SEAL)

[Here follows form of first coupon bond and form of certificate of the state auditor.]

"ENDORSEMENT

Number 000000

THE KANSAS STATE BOARD OF REGENTS

DORMITORY REVENUE BOND

Series A

$1,000

Chapter 435, Laws, 1947

Issue of $150,000

Three Percent

June 1, 1949

DORMITORY REVENUE BOND

Interest payable June 1 and December 1, principal due June 1, 195—.

Principal and interest payable at the office. of the Treasurer of the State of Kansas, at Topeka, Kansas, or at the subfiscal agency of the State of Kansas in the city of New York.

"REGISTRATION. Entries hereon must be made only by the treasurer of the State of Kansas, or his duly authorized representative.

| "Date of registry | Reg. Ref. | To whom registered | Signature of registry office |
|---|---|---|---|
| ................................. | ........................ | ................................. | ............................... |
| ................................. | ........................ | ................................. | ............................... |
| ................................. | ........................ | ................................. | ............................... |
| ................................. | ........................ | ................................. | ............................... |

"SEC. 3. The Board of Regents finds, determines and orders that there shall be issued Dormitory Revenue Bonds Series B in the total sum of Eight Hundred Thousand Dollars ($800,000) and that the issuance of Series B may be deferred by the Board until the Dormitory building constructed from the proceeds of Series A has been substantially completed, or until such time as the Board shall determine that the revenue from the dormitories, buildings and facilities pledged will be sufficient and adequate to meet maturities of Series A and Series B, Dormitory Revenue Bonds outstanding and to be issued. At the time of the issuance of Dormitory Revenue Bonds Series B, the Board of Regents shall designate by a supplemental resolution the denomination, maturity dates, interest rate and terms of call of such Dormitory Revenue Bonds Series B, and it is specifically recited that the revenues herein pledged for the payment of Series A shall be equally and irrevocably pledged for the payment of principal and interest of Series B when issued or so long as any Dormitory Revenue Bonds either, or both, of said Series A or Series B are outstanding and unpaid.

"SEC. 4. That to insure the payment of principal and interest when due the Kansas State Board of Regents and The Kansas State College of Agriculture and Applied Science hereby covenant and agree that they will pledge, and they do hereby irrevocably pledge, to make distribution of the gross revenue derived from room rent of the following-named buildings at the following rates percent for the following purposes: Van Zile Hall, Waltheim Hall, East Stadium Dormitory, West Stadium Dormitory and the new Women's dormitory to be constructed from the proceeds of the sale of Series A Dormitory Revenue Bonds, the sum of sixty percent (60%) of such gross rental for operating cost, thirty-five percent (35%) of such gross rental toward the retirement of Dormitory Revenue Bonds and interest thereon, and five percent (5%) of the gross rental for a reserve fund.

"That from the receipts from meals and board furnished to students in the aforesaid halls and dormitories, the Board of Regents and the Kansas State College of Agriculture and Applied Science hereby covenant and agree to allocate ninety percent (90%) of the gross receipts from meals and board for operation, eight percent (8%) of such receipts for the payment of principal and interest of Dormitory Revenue Bonds and two percent (2%) thereof for a reserve fund. The State Board of Regents specifically reserves the right to discontinue the furnishing of meals and board when in the judgment of the State Board of Regents the serving of such meals will not prove profitable.

*"It is recited and covenanted,* That the above and foregoing halls and dormitories are permanent installations which the State Board of Regents covenants that they will maintain and operate so long as any Dormitory Revenue Bonds are outstanding and unpaid. The State Board of Regents covenants and agrees that it will use its best efforts to the end that such buildings and facilities are rented on terms that will insure the receipts therefrom will be sufficient to meet bond and interest maturities when due.

| "Name of unit | Allocation for operation | Percentage allocated for bond and interest maturities | Percentage reserve |
|---|---|---|---|
| Campus Courts | 80% | 15% | 5% |
| West Campus Courts | 80% | 15% | 5% |
| College Apartments | 60% | 35% | 5% |
| Moro Courts | 70% | 25% | 5% |

"It is specifically recited that whenever in the opinion of the State Board of Regents the operation of any such dormitory facilities will not prove profitable its operation may be discontinued at any time. That so long as said facilities are in operation, the Board of Regents covenants that it will use its best efforts to the end that said units are rented for a consideration that is adequate to retire the Dormitory Revenue Bonds and interest at maturity as herein provided.

*"It is further covenanted and agreed,* By the Kansas State Board of Regents, That all utility service, and the service of all unclassified personnel employed in the operation or use of the dormitories or facilities whose revenue is pledged for payment of these Dormitory Revenue Bonds, will be furnished by the Kansas State College of Agriculture and Applied Science without charge against the operating cost, or the gross receipts of said dormitories and facilities.

"*It is further covenanted and agreed,* That the Kansas State Board of Regents will maintain in full force and effect adequate insurance of such type as it determines the best protection of the bondholders and in an amount equivalent to the outstanding, unpaid Dormitory Revenue Bonds issued pursuant hereto. .

"*It is further covenanted and agreed,* That the Kansas State Board of Regents will fix adequate rents, charges and fees sufficient to meet operating expenses and retire the bonds upon their respective maturities and pay interest thereon when due in accordance with the allocations of gross revenue as herein specified.

"Sec. 6. The Dormitory Revenue Bonds issued hereunder shall not be an indebtedness of the State of Kansas or of the Kansas State College of Agriculture and Applied Science, or of the State Board of Regents, or of the individual members of said board, and shall not constitute an indebtedness within the meaning of any constitutional or statutory limitation upon the incurring of indebtedness by the State of Kansas or the Kansas State College of Agriculture and Applied Science, or the Kansas State Board of Regents, and shall not become a general obligation of the State of Kansas, the Kansas State College of Agriculture and Applied Science, the Kansas State Board of Regents or the individual members thereof; nor shall these Revenue Bonds, or any judgment debt arising by reason of the issuance thereof, become a debt of the State of Kansas, the Kansas State College of Agriculture and Applied Science, the State Board of Regents or the individual members thereof; nor shall any general property tax ever be levied by the State of Kansas for the payment thereof.

"Sec. 7. The provisions of this resolution shall constitute a contract by and between the Kansas State Board of Regents and the holders of the Dormitory Revenue Bonds Series A and B, and the provisions of this resolution may be enforced in any court in accordance with the provisions of this resolution and 76-6a19, General Statutes Supplement of 1947.

"Sec. 8. The Chairman and Secretary of the Kansas State Board of Regents are hereby authorized and directed to prepare and execute Dormitory Revenue Bonds Series A in the sum of One Hundred and Fifty Thousand Dollars ($150,000), principal amount in the manner and form provided in this resolution, and shall cause the same to be registered in the office of the State Auditor of

Kansas, and when duly executed and registered, to deliver said bonds to the purchaser upon payment of the purchase price therefor.

"Sec. 9. That there shall be caused to be published once in the Official State Paper of the State of Kansas a notice to all persons interested, that this Board has determined to issue Dormitory Revenue Bonds under the laws of Kansas. Said notice shall be in substantially the following form:

"*To all persons interested:* [Here is contained the publication notice, required by § 13 of the act, of the board's determination to issue bonds, but included therein is contained the following additional statement.]

"*You are further notified,* That the Dormitory Bonds Series A and Series B are not an indebtedness of the State of Kansas, the Kansas State College of Agriculture and Applied Science, State Board of Regents or the individual members thereof, and are not payable directly or indirectly from the proceeds of any tax levy but are payable solely and only from revenue derived from the operation of certain dormitories and facilities of the Kansas State College of Agriculture and Applied Science."

(Thereafter is set forth proof of publication of notice required by § 13 of the act.)