Stegall, J.,
dissenting: I dissent for two reasons: first, the majority applies the wrong test; and second, even applying the majority’s newly fashioned test, the Counties cannot demonstrate the *872 unconstitutionality of K.S.A. 2014 Supp. 79-1460. Before discussing each of these flaws in todays decision, I first provide a short overview of tire history and purpose of K.S.A. 2014 Supp. 79-1460.
The History and Purpose of K.S.A. 2014 Supp. 79-1460
The challenged portions of K.S.A. 2014 Supp. 79-1460 together form a remedial measure designed to ensure the overall fairness and equality of an uncertain tax valuation process that is undeniably vulnerable to abuse. The majority’s implicit characterization of these provisions as a “tax relief*’ measure granted to a preferred class of property owners (as were the statutes at issue in both Martin I and Martin III, discussed in greater detail below) is simply wrong. This law does not grant anyone a straightforward tax benefit via a discount factor applied to his or her tax liability. Rather, it is a remedial measure designed to incentivize valuation reform across the property tax valuation system as a whole in order to arrive at a closer adherence to the legislature s mandate to value all property at its fair market value using statutory factors and methods. In this sense, the legislative objective in passing this measure was to improve the accuracy of the final tax burden across all property owners alike. This is a strikingly different purpose from the intent found to be “discriminatory” in both Martin I and Martin III. State ex rel. Stephan v. Martin, 227 Kan. 456, 467, 608 P.2d 880 (1980) (Martin I) (the purpose of the tax exemption at issue was to “reduc[e] the property tax liability of some owners of farm machinery and equipment”); State ex rel. Stephan v. Martin, 230 Kan. 759, 769, 641 P.2d 1020 (1982) (Martin III) (the purpose of the tax exemption at issue was to “grant tax relief by fixing a different, reduced, and discriminatory basis of assessment for certain property”).
The legislative history found in the 2013 legislative hearings on H.B. 2134—which would eventually become the now challenged subsections of K.S.A. 2014 Supp. 79-1460—indicates that the legislature had before it evidence of significant valuation abuse by county taxing authorities in Kansas and that the law was intended as a remedial measure to curb such abuse in the future. For example, the legislature heard that between 1997 and 2011 the aggregate property tax revenue in Kansas had increased from $1.97 *873 billion to $3.9 billion. This near doubling in 14 years amounted to “nearly triple the rate of inflation, ten times the rate of mill levy increases and nearly nine times [the rate] of population growth.” Testimony of Luke Bell, Kansas Association of Realtors, House Committee on Taxation, March 6, 2013. Given that the legislature heard that property tax revenue growth far exceeded the growth in both population and the aggregate tax rate, the explanation for the increase could only be either (1) a dramatic and sustained spike in fair market property values vastly disproportionate to the overall rate of inflation, or (2) a systemic problem of over-valuation of property by county taxing authorities in Kansas.
It appears the legislature heard and considered evidence tending to point to tire second of these two possibilities. For example, the legislature was presented with an empirical study of all the approximately 18,000 tax appeals in the Court of Tax Appeals between 2006 and 2008. The study concluded that in 65 percent of those appeals, the taxpayer was awarded relief from excessive valuation. See Testimony of James Franko, Kansas Policy Institute, House Committee on Taxation, March 6, 2013. Finally, the legislature heard the testimony of the representative of the Kansas Association of Realtors “advocating on behalf of the states 700,000 homeowners” that “county appraisers” disregard tax appeal findings by “simply increas [ing] tire proposed valuation of the subject property back to the originally proposed amount that was the subject of tire appeal in the next taxable year following the successful appeal.” Testimony of Luke Bell, Kansas Association of Realtors, House' Committee on Taxation, March 6, 2013.
In 2014, during the following legislative session, H.B. 2134 was amended into H.B. 2614, which in turn was amended into House Substitute for S.B. 231 and was eventually passed by the Kansas House by a vote of 124-0 and by the Kansas Senate by a vote of 26-13. Minutes, House Committee on Taxation, February 25, 2014, March 13, 2014; House J. 2014, p. 2923; Sen J. 2014, p. 2873. Given this legislative history, it is reasonable to conclude that the legislature overwhelmingly favored fixing, or at least remediating, a problem of excessive valuation that had become systemic in our property taxation scheme.
*874 Challenges under Article 11, § 1 of the Kansas Constitution Should Be Reviewed Using the Rational Basis Test
When the Counties petitioned this court for a writ of mandamus, they began by declaring that the “tax exemption” contained in K.S.A. 2014 Supp. 79-1460 “does hot meet the rational basis test.” After we ordered briefing on the Counties’ petition, they responded by saying “[i]t is not denied that the rational basis test applies.” When discussing the merits of their claim, the remainder of the Counties’ filings in this case are spent exclusively arguing that “there is no rational basis for” K.S.A. 2014 Supp. 79-1460.
This should come as no surprise given that this court has a long history—extending back at least to 1942—of applying a rational basis test to challenges arising under article 11, § 1 of the Kansas Constitution. This is because it has long been axiomatic and “safe to say [that] the equal protection clause of the federal constitution and state constitutional provisions pertaining to equality and uniformity of taxation are substantially similar and that, in general, what violates one will contravene the other and vice versa.” Associated Rly. Equipment Owners v. Wilson, 167 Kan. 608, 617, 208 P.2d 604 (1949) (citing 51 Am. Jur., Taxation § 169). We have consistently repeated this principle across a wide spectrum of tax cases over the course of decades. See, e.g., Colorado Interstate Gas Co. v. Beshears, 271 Kan. 596, 609, 24 P.3d 113 (2001) (stating that “[w]e have held that the protection granted by uniform and equal rate of assessment and taxation provision found in Article 11, § 1 of the Kansas Constitution is virtually identical to the protection granted under the Equal Protection Clause” in the context of a challenge to preferential tax treatment granted to railroads but denied to pipeline companies); State ex rel. Tomasic v. Kansas City, Kansas Port Authority, 230 Kan. 404, 426, 636 P.2d 760 (1981) (Tomasic I) (stating that “[w]here constitutional challenges have been made to tax exemption schemes as violative of Article 11, Section 1, of the Kansas Constitution, this court has consistently held that the uniform and equal rate of assessment and taxation provision is, in principle and effect, substantially identical to the principle of equality embodied in the Equal Protection Clause of the United *875 States Constitution” in the context of a challenge to the Kansas Port Authority Act’s tax exemption provisions for industrial-use facilities financed by local revenue bonds); Topeka Cemetery Ass’n v. Schnellbacher, 218 Kan. 39, 43, 542 P.2d 278 (1975) (stating “the equal protection clause of the federal constitution and state constitutional provisions pertaining to equality and uniformity of taxation are substantially similar and drat, in general, what violates one will contravene the other and vice versa” in the context of a challenge to a statute exempting from taxation cemetery land owned by individuals for use as grave sites while not exempting cemetery lands owned by corporations).
In 1942 we explained why we have traditionally applied a rational basis test to claims that a tax measure abrogates the rights and interests protected by the principles of equal protection which form the gravamen of article 11, § 1 of our constitution.
“ ‘A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it.’” Natural Gas Pipe Line Co. v. Commission of Revenue and Taxation, 155 Kan. 416, 422, 125 P.2d 397 (1942) (quoting Carmichael v. Southern Coal Co., 301 U.S. 495, 509, 57 S. Ct. 868, 81 L. Ed. 1245 [1937]).
“ ‘Not discrimination as such but only unreasonable and arbitrary discriminations are prohibited by state and federal constitutions.’” Natural Gas, 155 Kan. at 423 (quoting St. Louis Union Trust Co. v. State of Missouri, 348 Mo. 725, Syl. ¶ 3, 155 S.W.2d 107 [1941]).
While Natural Gas was primarily an income tax case, the legal test was clearly established that when the Kansas Constitution demands that taxation of all types be “equal and uniform,” it is not prohibiting every single deviation from absolute uniformity, but only those discriminations that are “unreasonable and arbitrary.” In the years since Natural Gas, we have repeatedly applied this rational basis test to property tax challenges arising under article 11, § 1. See, e.g., In re Tax Exemption Application of Central Illinois Public Services Co., 276 Kan. 612, 622-24, 78 P.3d 419 (2003) (applying rational basis to argument that the Board of Tax Appeals interpretation of the law resulted in “unequal treatment [that] violates the uniform and equal rate of assessment and taxation clause of article *876 11, § 1 of the Kansas Constitution”); State ex rel. Stephan v. Parrish, 257 Kan. 294, 302, 891 P.2d 445 (1995) (applying rational basis review to article 11, § 1 challenge to tax exemption for unreported property); State ex rel. Tomasic v. City of Kansas City, 237 Kan. 572, 578-79, 701 P.2d 1314 (1985) (Tomasic II) (applying rational basis review to article 11, § 1 challenge to statutory exemption from property taxes); Von Ruden v. Miller, 231 Kan. 1, 10, 642 P.2d 91 (1982) (equal protection and article 11, § 1 challenge); Tomasic I, 230 Kan. at 412, 426 (applying rational basis review to constitutional challenges to law authorizing tax exemption under Equal Protection Clause and article 11, § 1); Topeka Cemetery Ass’n, 218 Kan. at 43 (article 11, § 1 challenge); State, ex rel, v. Board of Regents, 167 Kan. 587, 596-97, 207 P.2d 373 (1949) (applying rational basis review to article 11, § 1 challenge to exemption of revenue bonds from taxation); Hartman v. State Commission of Revenue and Taxation, 164 Kan. 67, 70-71, 187 P.2d 939 (1947) (equal protection and article 11, § 1 challenge); State, ex rel, v. State Commission of Revenue and Taxation, 163 Kan. 240, 249, 181 P.2d 532 (1947) (constitutional challenge to tax laws under the Equal Protection Clause and article 11, § 1).
In the face of these precedents, the majority today creates and applies a new test never before articulated. Namely, that when it comes to valuation, no deviations from absolute uniformity shall be tolerated, no matter how justified. The majority articulates the rule that anything that prevents the valuation of “taxable real property at its actual fair market value in any tax year” is unconstitutional. 303 Kan. 844, Syl. ¶ 6. This test is extrapolated from the three Martin cases. Martin I, 227 Kan. 456; State ex rel. Stephan v. Martin, 230 Kan. 747, 641 P.2d 1011 (1982) (Martin II); Martin III, 230 Kan. 759. The majority dismisses the precedential value of the decisions cited above on the grounds that they “inartful[ly]” referred to article 11, § 1 in the context of equal protection considerations and rational basis review with “sweeping terms.” 303 Kan. at 865. This conclusion is supported by an effort to distinguish equality and uniformity in valuation from equality and uniformity in taxation. Similarly, the majority tries to distinguish todays statutory scheme, and the ones under consideration in the Martin cases, from the *877 exemption schemes which were later judged using a rational basis test. See 303 Kan. at 865-66. When we consider the purpose and function of article 11, § 1, however, (along with the actual language used by this court in the Martin line of cases) these distinctions are ephemeral.
First, valuation considered in a vacuum, without relation to the tax rate, has no constitutional weight or meaning. The constitutional purpose behind requiring a uniform and equal valuation is solely to arrive at a uniform and equal distribution of taxation. If, for example, the rate of taxation were zero, the valuations would be meaningless.
“Uniformity in taxing implies equality in the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in tire rate of taxation....
“It is apparent that uniformity is necessaiy in valuing property for assessment purposes so that the burden of taxation will be equal.” Addington v. Board of County Commissioners, 191 Kan. 528, 531-32, 382 P.2d 315 (1963).
“ ‘Uniformity in taxing implies equality in the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in the rate of taxation.
“‘. . . Uniformity of taxation does not permit a systematic, arbitrary or intentional valuation of the property of one or a few taxpayers at a substantially higher valuation than that placed on other property within the same taxing district; however, this uniformity and equality in a constitutional and statutoiy sense does not require mathematical exactitude in tire assessment valuation of property for taxation. [Citations omitted.]”’ Beardmore v. Ling, 203 Kan. 802, 806, 457 P.2d 117 (1969), disapproved on other grounds by Gordon v. Hiett, 214 Kan. 690, 697, 522 P.2d 942 (1974).
In short, article 11, § 1 “prohibits all favoritism, requiring all to contribute in proportion to their means to the support of the public burdens/” Wheeler v. Weightman, 96 Kan. 50, 54, 149 P. 977 (1915) (discussing purpose of article 11). Given these authorities, there is no sensible explanation for allowing the legislature some leeway from absolute equality—when supported by a rational basis—as it relates to the final tax burden borne by citizens, but not allowing the legislature any leeway when it comes to the method of valuation. Valuation is merely one component of tire formula for arriving at the burden of taxation. It defies logic to impose a “uniform and equal” rubric of absolute rigor on one variable in an equation *878 (valuation) but a more relaxed and deferential standard on the ultimate result of the equation (taxation).
Perhaps more significantly, the majority’s efforts to shield the Martin holdings from the impact of this court’s subsequent opinions concerning tax exemptions cannot survive a simple consideration of tire language used in Martin I. The statutory scheme at issue there—a flat 20 percent reduction of value applied to certain property—was described as a “partial exemption” and was defined as: “‘A law . . . omitting from assessment portions of any particular property, thus lessening the estimate of its value, has the effect of exempting it to that extent from taxation.”’ 227 Kan. at 467 (quoting Huntington v. Worthen, 120 U.S. 97, 101, 7 S. Ct. 469, 30 L. Ed. 588 [1887]). A few years later, in Tomasic II, 237 Kan. at 579, this court heard another challenge to the constitutionality of a tax exemption statute and we gave a four-element test for the constitutionality of such exemptions:
“(1) whether the exemption furthers the public welfare, State, ex rel., v. Board of Regents, 167 Kan. 587, 207 P.2d 373 (1949); (2) whether the exemption provides a substantial, peculiar benefit, Alpha Tau Omega v. Douglas County Comm’rs., 136 Kan. 675, 18 P.2d 573 (1933); (3) whether the exemption provides for large accumulations of tax-exempt property; and (4) whether the exemption is an improper or preferential classification of property, State, ex rel., v. Board of Regents, 167 Kan. 587.”
These factors look a great deal like a rational basis test. And indeed, a review of Martin I suggests that the court was not, as the majority would have it, imposing a rule of strict compliance on the legislature. While the Martin I court does not explicitly say it was conducting a rational basis review (perhaps it was “inartful”), its reasoning, at least in part, partakes of elements of a rational basis test. For example, the Martin I court says that article 11, § 1 “prohibits favoritism” and thus, “the crucial inquiry is the legislative intent and purpose for enacting” the exemption. 227 Kan. 456, Syl. ¶ 10, 462. The court then analyzed the purpose of the exemption at hand and concluded that none of the legislature’s reasons could “justify tire discriminatory subclassification” of property. 227 Kan. at 467. The court explained:
“[T]he Court can take judicial knowledge of the fact that even though there has been an inflation of property values in recent year's, the rate of inflation was not *879 15% in 1978, nor was it 20% in 1979. Thus, neither the fixed percentage rate reduction ordered by the provisions of 79-342, nor those of its predecessor, K.S.A. 1978 Supp. 79-342, can be justified on the basis of the inflation rate. Second, to shield certain property, that is, ‘farm machinery and equipment,’ from the effects of inflation, when inflation is affecting all property, is an act of discrimination, inconsistent with art. 11, § 1 of the Kansas Constitution.” 227 Kan. at 467.
When viewed in the larger context of the history of this court’s jurisprudence surrounding article 11, § 1, tire Martin I treatment begins to look suspiciously like a rational basis review. But regardless, to the extent the Martin line of cases intended to establish, and did establish, the rule the majority now applies, that line of cases was simply .wrong and was overruled by our subsequent cases permitting property tax exemptions when rationally related to some legitimate public purpose. Applying the Tomasic I test, or any other version of a rational basis review, K.S.A. 2014 Supp. 79-1460 would pass constitutional muster. It is clearly an exemption from valuation during a limited 2-year period of time. It is clearly rationally related to a legitimate public purpose. It does not establish an arbitrary or discriminatory subclassification of property, and it cannot result in any large accumulation of exempt property.
Even Applying the New Test Articulated by the Majority, K.S.A. 2014 Supp. 79-1460 Is Constitutional
Finally, I dissent because the majority misapplies its own newly created test. Martin II is the key case to understanding the rule the majority draws out of tire entire Martin line. In Martin II, the court upheld a statutorily imposed flat 40 percent reduction in value applied to a certain subclass of property. 230 Kan. at 749, 758. How does such a scheme survive todays rule? Because, as described in Martin II and discussed in detail by the majority above, the 40 percent reduction in value was reasonably calculated to more nearly reflect the fair market value of the subclass of property when that subclass had been subject to erroneous over-valuations—in other words, when the partial exemption scheme was intended to be a remedial measure designed to “correct an error”—to use the words of Martin I. 227 Kan. at 465. We described the failure or refusal of “local assessors... to take into consideration the ‘flush production’ feature of new wells” and who thus “arrive[d] at [an] . . . excessive *880 valuation and assessment.” Martin II, 230 Kan. at 749. Due to these facts, [legislation was needed to correct the assessment practices in the State of Kansas which resulted in an over-assessment.’ ” 230 Kan. at 749. Thus, the partial exemption was “designed to ameliorate the ‘misleading phenomena of flush production.’ ” 303 Kan. at 868 (quoting Martin II, 230 Kan. at 755).
But there should be no doubt that it would be reasonable for the legislature to conclude that the “phenomena” of valuation abuse by counties—when proven in a specific case with regard to specific real property—is likely to be just as (if not far more) “misleading” when it comes to subsequent valuations than the “flush production” phenomena at issue in Martin II. In that case, we determined that the legislature was constitutionally permitted to establish a downward valuation offset because the results of the ordinary and uniformly applicable valuation methods “often resulted] in excessive valuation” when applied to a specific and clearly defined subclass of property—i.e., new wells. Martin II, 230 Kan. at 749; see also 303 Kan. at 862 (discussing same). Given the legislature’s determination that the ordinary valuation process lacked credibility when applied to new wells, we held the legislature was justified in crafting a remedial offset measure designed to “more nearly” approximate the fair market value of that subclass of property. 230 Kan. at 755.
Here, the reasonableness of the legislature’s remedial efforts is even further beyond reproach. Here, the legislature did not need to resort to generalities about a subclass of property that was “often” over-valued. The legislature crafted a remedial provision that only applies to a subclass of property that has been proven to have been over-valued. That is the very definition of the subclass of property at issue in this case. Given this demonstrated failure of the ordinary valuation methods to arrive at fair market value, the holding of Martin II strongly suggests that the legislature was justified in crafting a remedial measure designed to more nearly approximate the fair market value.
Stating it plainly, if it has been conclusively determined that property has been over-valued in tax year 1, which valuation is more likely to reflect the true fair market value of that same property in tax years 2 and 3: (1) the fair market value established in tax *881 year one by a neutral and detached magistrate upon hearing and evaluating the evidence as presented by both parties; or (2) a revaluation of the same property in tax years 2 and 3 conducted by the party that was conclusively determined, by the neutral and detached magistrate, to have over-valued the property in tax year 1?
As a court, we need not decide the question one way or the other. We need only ask whether it is reasonable for the legislature to conclude as a matter of policy that tire first option “more nearly” represents the fair market value of the subclass of property. This is because, as discussed, even applying the majority’s preferred analytical rubric at work in Martin II, the legislature may dictate the various factors that go into a determination of fair market value even when those factors impact different subclasses of property differently—so long as' those factors are reasonably calculated to “more nearly” reflect fair market value.
Given this, even were I to accept the majority’s extrapolation of the Martin fine of cases into a bright-line rule dictating that any legislative policy or command—even if narrowly tailored to further a compelling state interest—that “prevents . . . valuing taxable real property at its fair market value in any tax year” is unconstitutional, I could not conclude that K.S.A. 2014 Supp. 79-1460 violates article 11, § 1. Simply put, after resolving “all doubts ... in favor of upholding” the law (as the majority claims it has done, see 303 Kan. at 858), it is clear to me that the short, remedial, 2-year safe harbor accorded the subclass of property at issue here is reasonably calculated to more nearly arrive at the actual fair market value of that property during tax years 2 and 3 than would «the alternative method of permitting a proven bad actor to re-value the property each year.
With respect to this narrow subclass of property, the legislature has essentially put the county valuation expert in a 2-year “time out” in response to his or her proven lack of credibility. In the absence of a refiable, yearly valuation established by methods that are ordinarily credible, the legislature has reasonably concluded that the best remaining measure of fair market value during the 2-year safe harbor period is the fair market value from tax year 1 as determined by the neutral and detached arbiter of the appellate process.
*882 The Economic Conclusions Drawn by the Majority Are Faulty
As a concluding matter, a cautionary word seems appropriate concerning the majority’s faulty analysis of the economic impact of K.S.A. 2014 Supp. 79-1460. The majority insists that “all property taxpayers who are not the beneficiaries of the statute’s preferential 2-year fixed valuations are adversely impacted.” Slip op. at 10. While it is beyond the scope of this dissent to conduct a thorough economic analysis of the impact of K.S.A. 2014 Supp. 79-1460 on taxpayers who do not fall within the 2-year safe harbor, the majority’s assumption that all of these taxpayers are adversely impacted is questionable. The majority’s economic analysis, to the extent it exists at all, is premised on reductive zero-sum assumptions which dictate that any benefit conferred on one economic actor must by necessity have been taken from some other actor.
But a substantial body of academic literature has demonstrated that dynamic, as opposed to static, economic modelling more accurately reflects reality, especially when it comes to understanding the impact of legal rules on future outcomes. See generally Posner, Economic Analysis of Law (9th ed. 2014). “Instead of after-the-fact static analysis of the distributional consequences of a [rule],” we ought to consider “the dynamic consequences of today’s [rule] on future economic actors.” Butler, Drahozal & Shepherd, Economic Analysis for Lawyers 33 (3d ed. 2014). Simply put, incentives matter. And not just in the private marketplace. Public choice theorists have shown that “political decision makers behave just like consumers and businesses. . . . They are constantly looking to exploit opportunities for gain within the political system.” Butler, Drahozal & Shepherd, Economic Analysis for Lawyers 130.
One of the surprising and sometimes counterintuitive insights judicial decision makers should draw from the law and economics school is that what may sometimes appear to be the most “fair” result is, in actuality, the result which may perpetuate the conditions giving rise to the perceived inequities in the first instance. Judges tend to view cases from the ex post, after-the-fact perspective given that “[t]he nature of litigation invites judges to treat the parties’ *883 circumstances as fixed and to apportion gains and losses.” Easter-brook, The Supreme Court, 1983 Term, Foreward: The Court and the Economic System, 98 Harv. L. Rev. 4, 10 (1984). Moreover, judges “who see economic transactions as zero-sum games are likely to favor ‘fair divisions of the gains and losses.” Easterbrook, at 12. When considering the economic impact of different legal rules, however, it is better for a judge to take the ex ante, forward-looking perspective. Then, in any specific case, “if legal rules can create larger gains (or larger losses), the claim from fairness becomes'weaker. The judge will pay less attention to todays unfortunates and more attention to the affects of rules.” Easterbrook, at 12. Which perspective judges choose to take, then, “will depend, in part, on the extent to which they appreciate how the economic system creates new gains and losses; those who lack this appreciation will favor ‘fair treatment of the parties.” Easterbrook, at 12.
The point Professor (now Judge) Easterbrook drives home is that the result that is “fair” from an ex post perspective may in fact be the most costly rule, resulting in the perpetuation of larger, systemic inequities or mal-distributions. In the case of legal rules of deterrence, the economic impact of changes in future behavior that arise in response to incentives may end up outweighing the costs of imposing the rule in any specific case. All economically efficient legal rules of deterrence work this way. Such rules exist and are economically beneficial to everyone when “the marginal cost of enforcement”—in this case the very slight differences in assessed value that may accrue between two groups of taxpayers in tax years 2 and 3—is balanced or outweighed by the “reduction in harm that results from enforcement”—in this case the benefit that accrues to all taxpayers when they avoid over-valuation in tax year 1. Butler, Drahozal & Shepherd, Economic Analysis for Lawyers 393. As Professor Coase wrote in his seminal article "The Problem of Social Cost”:
“What has to be decided is whether the gain from preventing the harm is greater than the loss which would be suffered elsewhere as a result of stopping the action which produces the harm. In a world in which there are costs of rearranging the rights established by the legal system, the courts . . . are . . . making a decision on the economic problem and determining how resources are to be employed.” Coase, The Problem, of Social Cost, 3 J.L. & Econ. 1, 27 (1960).
*884 So while the analytical tools provided by the law and economics school do not have a direct bearing on the constitutional questions posed in this case, they do cast an unhappy shadow on the sunny optimism animating the majority’s preferred outcome. In other words, the majority’s hope that today’s decision will be an economic boon for taxpayers across the system is almost certainly misplaced.
For these reasons, I dissent.