IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,827

BOARD OF COUNTY COMMISSIONERS OF
JOHNSON COUNTY, KANSAS, *et al.*,
*Petitioners*,

v.

NICK JORDAN, in His Official Capacity as
SECRETARY OF THE KANSAS DEPARTMENT OF REVENUE

and

DAVID N. HARPER, in His Official Capacity as
DIRECTOR OF PROPERTY VALUATION,
KANSAS DEPARTMENT OF REVENUE,
*Respondents*.

SYLLABUS BY THE COURT

1.

Mandamus is a proper remedy when the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that another adequate remedy at law exists.

2.

Standing is a party's right to make a legal claim or seek judicial enforcement of a duty or right. Standing is a jurisdictional question in which courts determine whether a party has alleged a sufficient stake in the outcome of a controversy to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on that party's behalf.

3.

In order to establish standing, a plaintiff must show that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct. In order to establish a cognizable injury, a party must show that he or she has a personal interest in the outcome of a case and personally suffers some actual or threatened injury as a result of the challenged conduct.

4.

Article 11, § 1 of the Kansas Constitution requires the legislature to provide for a uniform and equal basis of valuation and rate of taxation of all property subject to taxation.

5.

The legislature has statutorily provided that all taxable property must be listed and valued every January 1. Real property, other than property devoted to agricultural use, is appraised at fair market value on that date.

6.

K.S.A. 2014 Supp. 79-1460 is unconstitutional to the extent it prevents appraisers from valuing taxable real property at its actual fair market value in any tax year.

7.

Whether a court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said the act would have been passed without the objectionable portion and if the statute would operate effectively to carry out the intent of the legislature with such portion stricken, the remainder of the law will stand as valid.

8.

Subsections (a)(2) and (c) may be severed from K.S.A. 2014 Supp. 79-1460, so that the rest of the statute remains effective.

Original action in mandamus. Opinion filed February 24, 2016. Writ of mandamus granted.

*Kathryn D. Myers*, assistant county counselor, argued the cause and was on the briefs for petitioners.

*Amelia S. Kovar-Donohue*, special assistant attorney general, and *M.J. Willoughby*, assistant attorney general, argued the cause and were on the brief for respondents.

The opinion of the court was delivered by

BILES, J.: This is an original action in mandamus challenging a unique aspect of the State's statutory methodology for valuing real property for ad valorem taxation purposes. It is brought by 21 boards of county commissioners against Nick Jordan, Secretary of the Kansas Department of Revenue, and David N. Harper, Director of Property Valuation.

The dispute concerns Harper's statewide directive to county appraisers requiring compliance with K.S.A. 2014 Supp. 79-1460, which prohibits increasing the valuation of real property for 2 tax years after a successful valuation appeal without documented substantial and compelling reasons to do so. Generally speaking, all other taxable real property is reappraised annually at fair market value. The Counties argue this dichotomy between property that was subject to a successful valuation appeal and all other property violates our state's constitutional mandate to the legislature to provide a "uniform and equal basis of valuation and rate of taxation of all property subject to taxation." Kan. Const. art. 11, § 1(a) (2014 Supp.). We agree with the Counties.

The legislature has statutorily provided that all taxable property must be listed and valued every January 1. See K.S.A. 79-309. Real property, other than property devoted to agricultural use, is appraised at fair market value on that date. See K.S.A. 79-501; see also Kan. Const. art. 11, § 12 (providing land devoted to agricultural use may be valued on basis of agricultural income or productivity). But the challenged statute changes this for a discrete group of taxpayers by insulating them from the annual valuation process. Such preference is constitutionally forbidden. See *State ex rel. Stephan v. Martin*, 227 Kan. 456, 468, 608 P.2d 880 (1980) (*Martin I*) (Kan. Const. art. 11, § 1[a] "prohibits favoritism, and requires uniformity in valuing property for assessment purposes so that the burden of taxation will be equal.").

We hold K.S.A. 2014 Supp. 79-1460 is unconstitutional to the extent it prevents appraisers from valuing taxable real property at its fair market value in any tax year. We further hold that subsections (a)(2) and (c) of K.S.A. 2014 Supp. 79-1460, which are the constitutionally offending provisions, are severable from the remainder of the statute. The writ of mandamus is issued and relief ordered to preclude respondents from further efforts to implement the stricken statutory provisions.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are straightforward and undisputed. The legislature enacted K.S.A. 2014 Supp. 79-1460, effective July 1, 2014. Under the statute, when a property owner successfully appeals a property valuation, subsection (a)(2) prevents the valuation from being increased during the next 2 tax years unless certain conditions are met. Subsection (a) states:

> "The county appraiser shall notify each taxpayer in the county annually on or
> before March 1 for real property and May 1 for personal property, by mail directed to the
> taxpayer's last known address, of the classification and appraised valuation of the

4

taxpayer's property, except that, the valuation for all real property shall not be increased unless: (1) The record of the latest physical inspection was reviewed by the county or district appraiser, and documentation exists to support such increase in valuation in compliance with the directives and specifications of the director of property valuation, and such record and documentation is available to the affected taxpayer; and (2) *for the next two taxable years following the taxable year that the valuation for real property has been reduced due to a final determination made pursuant to the valuation appeals process, documented substantial and compelling reasons exist therefor and are provided by the county appraiser.*" (Emphasis added.)

The statute goes on to limit the "documented substantial and compelling reasons" for a county appraiser to increase the qualified property's valuation during the 2-year grace period by specifying:

"(c) For purposes of this section:

(1) The term 'substantial and compelling reasons' means a change in the character of the use of the property or a substantial addition or improvement to the property;

(2) the term 'substantial addition or improvement to the property' means the construction of any new structures or improvements on the property or the renovation of any existing structures or improvements on the property. The term 'substantial addition or improvement to the property' shall not include:

(A) Any maintenance or repair of any existing structures, equipment or improvements on the property; or

(B) reconstruction or replacement of any existing equipment or components of any existing structures or improvements on the property."

On May 16, 2014, Harper issued Directive #14-047 pursuant to his statutory responsibilities as property valuation director to enforce ad valorem property tax statutes. See, *e.g.*, K.S.A. 2014 Supp. 79-505(a) (director authorized to adopt appraiser directives

5

prescribing standards for appraisals concerning ad valorem taxation); K.S.A. 79-1404 *Second* (director's duty to confer with, advise, and direct appraisers, boards of commissioners, and others obligated to make levies and assessments as to their duties under Kansas statutes); K.S.A. 2014 Supp. 79-1460(a)(1). Directive #14-047, in part, instructed all county appraisers to comply with K.S.A. 2014 Supp. 79-1460(a):

> "When the valuation for real property has been reduced due to a final determination made pursuant to the valuation appeals process the county appraiser shall comply with K.S.A. 79-1460. This requirement is a jurisdictional exception when it prevents the value of a parcel from increasing to the value as indicated by the mass appeal appraisal process."

On November 30, 2015, the Counties filed this original action in mandamus to challenge the constitutionality of K.S.A. 2014 Supp. 79-1460 and, consequently, Harper's Directive #14-047. Petitioners are the boards of county commissioners for Johnson, Barton, Chautauqua, Cowley, Douglas, Elk, Ellis, Finney, Franklin, Geary, Harper, Harvey, Leavenworth, Lyon, McPherson, Miami, Ness, Pottawatomie, Reno, Riley, and Wyandotte Counties.

In their petition, the Counties note their county appraisers are required by law to send a "Notice of Valuation" for each parcel of real property in their jurisdictions no later than March 1, 2016, using the valuation methodologies fixed by law. They claim further that if their appraisers comply with K.S.A. 2014 Supp. 79-1460(a)(2) by maintaining a valuation reduced during the 2015 valuation appeal process, they potentially face litigation from other taxpayers as tax burdens within their counties shift due to the undervaluing of property caused by compliance with K.S.A. 2014 Supp. 79-1460(a)(2). They also note if they refuse to comply with Harper's directive, their county appraisers face possible removal from office or other penalties under the property valuation director's statutory authority. See K.S.A. 79-1404.

6

On December 7, 2015, this court ordered Jordan and Harper to answer the petition no later than December 18. See Supreme Court Rule 9.01(c)(3) (2015 Kan. Ct. R. Annot. 88). But on that date, respondents instead moved for an extension of time until January 8, 2016, to respond. On December 22, this court denied the extension because of the looming March 1 deadline for valuations and set a schedule for briefing and oral arguments.

In their brief, respondents oppose the requested relief, arguing: (1) this is not an appropriate case to exercise our discretionary original jurisdiction; (2) the Counties lack standing because they fail to allege an actual injury giving rise to suit; and (3) the statute is constitutional because it is rationally related to legitimate government interests. In the alternative, if we hold K.S.A. 2014 Supp. 79-1460(a)(2) and (c) are unconstitutional, respondents argue the challenged provisions are severable from the remainder of K.S.A. 2014 Supp. 79-1460. We consider those arguments in that sequence.

EXERCISING ORIGINAL JURISDICTION IS APPROPRIATE

A mandamus action seeks "to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." K.S.A. 60-801. Judgments in mandamus must specify with particularity the acts or act the respondent is compelled to perform or enjoined from performing. K.S.A. 60-802. This court has original jurisdiction in mandamus. Kan. Const. art. 3, § 3 ("The supreme court shall have original jurisdiction in proceedings in quo warranto, mandamus, and habeas corpus; and such appellate jurisdiction as may be provided by law.").

But as the parties correctly observe, under the circumstances of the present controversy, mandamus would also be an appropriate proceeding to initiate with the district court. See K.S.A. 60-801. And when there is concurrent jurisdiction, our

7

procedural rules recognize this court should exercise its original jurisdiction cautiously. See Supreme Court Rule 9.01(b) (2015 Kan. Ct. R. Annot. 88) ("An appellate court ordinarily will not exercise original jurisdiction if adequate relief appears to be available in a district court."); see also *State ex rel. Schmidt v. City of Wichita*, 303 Kan. ___, ___ P.3d ___, 2016 WL 275298, at *6 (January 22, 2016) ("[T]his court has traditionally been somewhat lenient on enforcement of that general rule."); *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 405, 197 P.3d 370 (2008) ("[T]his court has discretion to exercise its original jurisdiction even if relief also is available in the district court.").

Mandamus is a proper remedy when the essential purpose is to obtain an authoritative interpretation of law for the guidance of public officials in their administration of public business, notwithstanding the fact that there also exists an adequate remedy at law. *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 52, 687 P.2d 622 (1984). To this end, when a petition for mandamus "presents an issue of great public importance and concern, the court may exercise its original jurisdiction . . . and settle the question." 236 Kan. at 52; see also *Long v. Board of Wyandotte County Comm'rs*, 254 Kan. 207, 212, 864 P.2d 724 (1993) (mandamus appropriate when "an issue of law affects public officials, presents an issue of great public importance and significant State interest, and requires a speedy adjudication"); *State, ex rel., v. State Highway Comm.*, 132 Kan. 327, 334-35, 295 P. 986 (1931) ("The use of mandamus to secure a speedy adjudication of questions of law for the guidance of state officers and official boards in the discharge of their duties is common in this state.").

We have little difficulty fitting this case within our discretionary boundaries for consideration of an original action. The constitutionality of K.S.A. 2014 Supp. 79-1460 most certainly is an "issue of law" that "affects public officials" on both sides of the controversy. And when "a public official's action or refusal to act is based upon a statute

8

whose validity is challenged, mandamus may lie in appropriate cases." *Stephens v. Van Arsdale*, 227 Kan. 676, 682-83, 608 P.2d 972 (1980).

As Revenue Secretary, Jordan appointed Harper as property valuation director and Harper serves at the secretary's pleasure. See K.S.A. 2014 Supp. 75-5105. Harper, in turn, exercises "general supervision over the administration of the assessment and tax laws of the state, over the county and district appraisers, boards of county commissioners, county boards of equalization, and all other boards of levy and assessment." K.S.A. 79-1404 *First*. Harper expressly has "general supervision and direction of the county assessors in the performance of their duties, and shall regulate and supervise the due performance thereof." K.S.A. 79-1401. He also has authority to "adopt rules and regulations or appraiser directives prescribing appropriate standards for the performance of appraisals." K.S.A. 2014 Supp. 79-505. Harper even has authority to compel the attorney general or county attorneys to assist in proceedings to discipline or remove county appraisers who fail to follow applicable tax laws, even though those appraisers are county employees appointed and paid by the board of county commissioners in their respective taxing districts. See K.S.A. 79-1404 *Fourth*; K.S.A. 2014 Supp. 19-430.

On May 16, 2014, pursuant to his statutory responsibilities, Harper directed county appraisers to comply with K.S.A. 2013 Supp. 79-1460 when appraising real property for tax purposes. County appraisers were required to value taxable Kansas real estate in accordance with that directive as of January 1, 2015. K.S.A. 79-1412a(a) *Second*. Harper has indicated he will follow the statute. From this, we conclude the legal issue affects various public officials, *i.e.*, Jordan and Harper, as well as every county appraiser and board of county commissioners in the state.

Respondents also argue this controversy does not present an issue of great public importance and significant State interest because K.S.A. 2014 Supp. 79-1460 affects only a small taxpayer group, *i.e.*, those who have successfully appealed a property valuation.

9

They note the Counties refer to Johnson County, where it is represented that about 2.5 percent of the overall number of parcels in that county are appealed.

But any preferential valuation benefitting only a few properties will adversely influence the tax burden for all other taxpayers whose properties do not enjoy the preference. This is because the property tax rate within a given taxing district, such as a county in this instance, is determined by the aggregate amount of taxes to be levied against the aggregate valuation of the taxable property in that district. See K.S.A. 2014 Supp. 79-1803. The tax burden is borne by each property owner in proportion to the assessed value of his or her property. This means that when a taxpayer's property is undervalued in a tax year because the valuation used is from a prior tax year, the burden of supplying the necessary tax revenue due the taxing district is inevitably absorbed by the remaining property owners. In short, inequity in property valuation results in inequity in the ad valorem tax burden. See *Martin I*, 227 Kan. at 461-62. So despite respondents' suggestion that there is a small universe of persons affected, all property taxpayers who are not the beneficiaries of the statute's preferential 2-year fixed valuations are adversely impacted.

We conclude these circumstances describe an issue of great public importance and significant State interest. The relative tax burdens for all taxable property in our state appears impacted to some degree by this controversy. See *Wilson v. Sebelius*, 276 Kan. 87, 91, 72 P.3d 553 (2003) (accepting mandamus jurisdiction over statutory scheme for filling vacancies in public offices potentially impacting virtually every public office in the state).

Next, respondents suggest this case presents disputed questions of fact that a court would need to determine to scrutinize the legislature's reasons for enacting the original statute, its 2014 amendments, as well as the effect of the 2014 revision. If so, they contend, the case is better left to the district court or some other factfinding proceeding

10

that would delay consideration of the issues presented. See Supreme Court Rule 9.01(d) (Supreme Court may refer matter to district court judge or commissioner to take testimony and recommend findings of fact).

But the Counties raise a facial challenge to the statute's constitutionality, which is purely a question of law. And this court has repeatedly accepted original jurisdiction involving challenges to statutes' facial conformance with our constitution—though relief is not always granted on constitutional grounds. See *City of Wichita*, 303 Kan. ___, 2016 WL 275298 (original action in quo warranto challenging constitutionality of city ordinance under home rule amendment; case decided on statutory grounds); *Wilson*, 276 Kan. 87 (original action in quo warranto challenging constitutionality of statutes for filling vacancies in public office; statutes construed to avoid constitutional question); *Kansas House of Representatives*, 236 Kan. 45 (original action in quo warranto and mandamus challenging constitutionality of statute that permitted legislature to adopt, modify, and revoke administrative regulations without presentment to governor); *State ex rel. Stephan v. Martin*, 230 Kan. 759, 641 P.2d 1020 (1982) (*Martin III*) (original action in quo warranto challenging statute concerning valuation of farm machinery and equipment for ad valorem tax purposes under Kan. Const. art. 11, § 1).

And even under the respondents' arguments that the statute's constitutionality must be measured against the rational basis test to justify the differing treatments the statute affords to groups of taxpayers, that rational basis is still a question of law. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 369, 361 P.3d 504 (2015) (noting "[w]hether a statute violates equal protection is a question of law" and applying rational basis review to workers compensation statute).

Given our analysis of the principal issue, we view this case as one that can be readily decided by analyzing the statute against our constitution's uniform and equal mandate without need for further factual development.

11

Finally, respondents argue any need for a speedy adjudication due to the March 1 deadline for the Notification of Valuation required by K.S.A. 2014 Supp. 79-1460(a) is manufactured because the Counties waited more than a year after the 2014 amendments now found in K.S.A. 2014 Supp. 79-1460 to file this action. Even worse, respondents add, the predecessor statute, K.S.A. 1992 Supp. 79-1460, which contained a 1-year moratorium on valuation increases, has been effective for 23 years without judicial challenge. They cite *Long*, which characterized the need for a speedy adjudication as a necessary element for consideration in exercising mandamus. 254 Kan. at 213 ("It is only where an issue of law affects public officials, presents an issue of great public importance and significant state interest, and requires a speedy adjudication that mandamus is an appropriate and proper means to decide the issue.").

These are legitimate concerns, especially given the obvious strain on resources for all involved to decide this controversy expeditiously within the statutory framework. But what appears to be a preventable delay in bringing this action—while hard to fathom—is not fatal in this instance. A speedy adjudication would be required whenever a challenge to K.S.A. 2014 Supp. 79-1460 was brought because county appraisers carry out their work of valuing property throughout the year. See K.S.A. 79-1412a. And we give considerable weight to the fact that 21 boards of county commissioners, with a substantial portion of the state's taxable real property collectively within their taxing districts, joined to petition this court to resolve the controversy.

We hold that this case presents a question of law of significant statewide importance, affecting numerous public officials, as well as most every owner of taxable property in the state. Under the circumstances, our discretion is justified in exercising original jurisdiction in this mandamus action.

Respondents next argue the Counties lack standing to prosecute this action because they have not suffered a concrete, particularized injury. "'Standing is "a party's right to make a legal claim or seek judicial enforcement of a duty or right."'" *Gannon v. State*, 298 Kan. 1107, 1121, 319 P.3d 1196 (2014) (quoting *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 324, 255 P.3d 1186 [2011]). Standing is a jurisdictional question in which courts determine whether a party has alleged a sufficient stake in the outcome of a controversy to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on that party's behalf. *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750-51, 189 P.3d 494 (2008).

This court recently considered the standing necessary for a public official to bring a declaratory judgment action challenging a statute's constitutionality. We held that the plaintiff, in that case a district court chief judge, had standing because he had shown (1) a cognizable injury suffered; and (2) a causal connection between that injury and the challenged conduct. *Solomon v. State*, 303Kan. ___, ___ P.3d ___, 2015 WL 9311523, at *7 (December 23, 2015). To demonstrate a "cognizable injury," we said the person bringing the claim must show a personal interest in the court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct. 2015 WL 9311523, at *7. We concluded the chief judge's standing for declaratory judgment purposes was demonstrated by the dilemma faced in the performance of the chief judge's official duties caused by an alleged conflict between a statute and a Supreme Court Rule. 2015 WL 9311523, at *8. The Counties meet that test here.

The Counties note their county appraisers are required to send a Notice of Valuation for real property on March 1, 2016. They argue that if the county appraiser complies with the statute claimed to be unconstitutional, potential tax monies are lost for

2016 and possibly for 2017. But noncompliance could result in multiple appeals by individual taxpayers. The Counties could also lose additional tax monies for interest and refunds from the Counties' general funds. Moreover, the county appraisers could be removed from office or otherwise penalized if they do not follow the statute and directive.

The petition also cites Director Harper's Directive #14-047, which indicates the county commissioners serve as "the client" and the taxing districts are the "intended users of the appraisal."

In the Counties' reply brief, they expound further on the interrelationship between themselves, their county appraisers, and respondents with much emphasis on Director Harper's dominance of the appraisal process at the county level. The Counties note they appoint their county appraisers for 4-year terms expiring June 30 of the fourth year. See K.S.A. 2014 Supp. 19-430(a). But to be appointed, the person must meet eligibility requirements in rules and regulations adopted by Secretary Jordan. K.S.A. 2014 Supp. 19-430(b). Responsibility for funding the appraiser's duties and operations falls on the Counties. K.S.A. 79-1471 and K.S.A. 79-1401.

The Counties also explain that Director Harper's authority over both their appraisers and the Counties places them at risk if they refuse to follow Directive #14-047, even though the Counties believe the statute is unconstitutional. By way of example, K.S.A. 79-1404 *Third* provides Director Harper with authority to cause complaints to be made against county appraisers and county commissioners "for their removal from office for official misconduct or neglect of duty" for failure or neglect to comply with orders of the director of property valuation. K.S.A. 79-1405 gives the property valuation director "the power and authority to prosecute any member of any board of county commissioners and any county . . . for a violation of any of the rules and regulations which may be prescribed, or the violation of any statute of this state relating to the assessment and

14

valuation of property and the collection of taxes." See also K.S.A. 2014 Supp. 79-1479 (director may immediately assume duties of county appraiser if Board of Tax Appeals finds the county is not in substantial compliance with property appraisal requirements); K.S.A. 2014 Supp. 79-1426 (making knowing or willful failure to appraise or assess real estate as required by law a misdemeanor).

County commissioners take an oath of office swearing to support the Constitution of the state of Kansas and faithfully discharge their duties. See K.S.A. 54-106 and K.S.A. 75-4308. The county is the governmental unit "charged with the primary responsibility for the administration of all laws relating to the assessment, review, equalization, extension and collection of real and personal property taxes." K.S.A. 79-1411a. And the Counties are designated as the proper entity to levy taxes for county operations. See K.S.A. 79-1802; K.S.A. 2014 Supp. 79-1946. Indeed, the Counties levy taxes on property within their boundaries based on appraisals currently governed by K.S.A. 2014 Supp. 79-1460. As acknowledged in Directive #14-047, "county commissioners serve as the client and the taxing districts are the intended users of the appraisal." Moreover, the operations for which property taxes are levied include those of the county appraiser and his or her staff. See K.S.A. 79-1471.

The Counties also play an important role in protecting the uniformity of the ad valorem tax system as applied to property situated within their boundaries. The boards of county commissioners are empowered to petition the State Board of Tax Appeals for reappraisal of property within the county when "the appraisal of real property or tangible personal property in any county is not in substantial compliance with law and the guidelines and timetables prescribed by the director of property valuation . . . ." K.S.A. 2014 Supp. 79-1413a. And boards of county commissioners frequently are called upon to defend their appraisers' valuations in property tax appeals in the administrative tribunals and courts of this state. See, *e.g.*, *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 333 P.3d 899 (2014) (Board of Shawnee County

15

Commissioners appealing from decision of Court of Tax Appeals); *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, 283 P.3d 823 (2012); *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 88 P.3d 242 (2004).

We conclude the Counties have standing because they are squarely faced with a dilemma. The ad valorem tax system in which they play an integral role in their respective taxing districts suffers from a constitutional flaw in their view. And while they are considered the client of the appraisal process, with their taxing district the end user of its result, the Counties are powerless to perform their constitutional duties as they see them due to the director's authority over both them and their appraisers and his decision to comply with the challenged statute until ordered otherwise by this court. And if the process is allowed to unfold as contemplated by the statute, they foresee litigation from taxpayers affected by the statute, the loss of tax money for the payment of potential refunds, and possible penal action against county appraisers and other county officials. Under these circumstances, we hold that the Counties have standing to bring this action challenging the constitutionality of K.S.A. 2014 Supp. 79-1460.

### THE STATUTE VIOLATES THE CONSTITUTIONAL MANDATE

To understand the parties' dispute we begin by taking a broader view of the constitutional provision at issue. Article 11, § 1 of the Kansas Constitution is complicated and serves multiple purposes. In recognition of the fact that this section gets amended with some frequency, it establishes that the current provisions apply to all assessment and taxation of property on January 1, 2013, and each year thereafter. Then, it contains the language at issue stating that the legislature "shall provide for a uniform and equal basis of valuation and rate of taxation of all property subject to taxation." Section 1 then creates seven subclasses of property and indicates each subclassification must be "assessed uniformly" at certain percentages of value. It also recognizes that certain property "shall be exempted" from property taxation. Art. 11, § 1(b) (2014 Supp.).

16

Finally, it grants the legislature some discretion in exempting other property. Art. 11, § 1(a) (2014 Supp.). The controversy presented by the Counties focuses more narrowly on the provision requiring a "uniform and equal basis of valuation." And in accordance with this mandate, the legislature provides that all taxable property must be listed and valued every January 1. See K.S.A. 79-309.

The issue in this case concerns the valuation of real property. Real property, other than agricultural use property, is appraised at its fair market value every January 1. See K.S.A. 79-501. Fair market value is a defined term applicable to all taxable real property other than that used for agricultural purposes. See K.S.A. 2014 Supp. 79-503a. The dispute presented arises because the legislature made a unique exception to the process of valuing taxable real property.

K.S.A. 2014 Supp. 79-1460 provides that if a taxpayer successfully appeals the valuation in a tax year this valuation cannot be raised for the next 2 tax years without documented substantial and compelling reasons to do so. And the term "substantial and compelling reasons" is statutorily limited by its definition. The combined effect of K.S.A. 2014 Supp. 79-1460 is to relieve a select group of taxpayers from the annual valuation process to which every other real property owner is subject. The question is whether this distinct treatment conflicts with the constitutional mandate "for a uniform and equal basis of valuation . . . of all property subject to taxation." We hold that it does.

*Presumption of Constitutionality*

Whether a statute is constitutional is a question of law. But before a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it. If a court can find any

17

reasonable way to construe the statute as valid, it must. *Solomon*, 2015 WL 9311523, at *9.

*The Test for Constitutionality*

The parties agree we must decide whether K.S.A. 2014 Supp. 79-1460 conforms with the "uniform and equal basis of valuation" clause in article 11, § 1(a) of the Kansas Constitution. Our threshold question concerns the appropriate test to use in deciding whether the statute conforms to our constitutional mandate for a uniform and equal basis of valuation and rate of taxation.

This court last addressed the constitutionality of statutes creating separate rules for the valuation of limited classes of property in a trio of cases in the early 1980s. See *State ex rel. Stephan v. Martin*, 227 Kan. 456, 608 P.2d 880 (1980) (*Martin I*); *State ex rel. Stephan v. Martin*, 230 Kan. 747, 641 P.2d 1011 (1982) (*Martin II*); *Martin III*, 230 Kan. 759. In these cases, the court tested the validity of such statutes by considering whether the special treatment given to the valuation of one group of property bears a "reasonable relationship to the actual fair market value" of the property. *Martin II*, 230 Kan. at 756. In other words, the court considered only whether the statutes at question were designed to value the subject property on the same basis as all other taxable property not excluded from the constitution's uniform and equal basis of valuation mandate. It is necessary to consider this trio of cases in detail.

The first case is *Martin I*, which delves into the historical rationale of the constitutional mandate. In that case, the court considered the validity of a statute that required appraisers to "'determin[e] the fair market value'" of farm machinery and equipment by subtracting 20 percent from the average value of the equipment prescribed in a state appraisal guide. 227 Kan. at 460. The statute permitted appraisers to deviate from the value established by this method "'when he or she determine[d] that the value

18

. . . [did] not reflect the fair market value of the particular property involved as provided for by'" the method. 227 Kan. at 460. In the statute's defense, the director of property valuation argued it was consistent with K.S.A. 79-503 (Weeks 1977), which enumerated factors to be taken into account in determining fair market value. This was because K.S.A. 79-503 (Weeks 1977) directed appraisers to consider (1) functional, economic, or social obsolescence; and (2) an allowance for abnormal inflationary factors influencing open-market sale values.

The *Martin I* court concluded the statute was not merely taking into account the "functional, economic or social obsolescence" of the property being valued but was really concerned with conditions affecting the owner. It explained the farm machinery and equipment statute was not designed to ensure farm machinery would be appraised at fair market value because it provided for a flat deduction from a guide value that was intended to establish the fair market value of the property in average condition. See 227 Kan. at 462-63. Instead, "[t]he legislature was granting relief to *persons—the owners of farm machinery and equipment—who were confronted with a severe economic crisis*." 227 Kan. at 464. The court further reasoned:

> "A finding that a subclassification of property was justified because of 'the severe economic crisis' confronting individual farmers and ranchers confuses *economic conditions* affecting property *owners* with *economic factors* affecting the *value* of property. Such reasoning confuses the *ad valorem property tax* with the *income tax*. Unlike the income tax, the property tax is based on the *value* of the property *itself*, not on the *income or economic condition* of the property's owner." 227 Kan. at 466.

As to the second factor, abnormal inflationary influences on value, the court held that did not justify the subclassification for two reasons. First, the rate of inflation in recent years had not approached the 20 percent reduction required by the statute. And second, "to shield certain property . . . from the effects of inflation, when inflation is

19

affecting all property, is an act of discrimination inconsistent with art. 11, § 1 of the Kansas Constitution." 227 Kan. at 467. The court concluded:

> "Based upon all the foregoing reasons, the Director's attempt to justify the enactment of [the statute] must be rejected, as the law is inconsistent with the provisions of art. 11, § 1 of the Kansas Constitution. By destroying the constitutionally required uniformity and equality in the assessment of all property, a partial exemption from taxation has been granted to farm machinery and equipment. The effect is to lessen the tax burden that should be borne by such property, all for the purpose of reducing the property tax liability of some owners of farm machinery and equipment." 227 Kan. at 467.

The court added that

> "[t]he ultimate effect of [the statute] was to lessen the legitimate estimate of the fair market value in money of certain items of farm machinery and equipment, and thus, exempt it to that extent from taxation. In this respect the law violates the requirement of art. 11, § 1 of the Kansas Constitution mandating uniformity and equality in the basis of assessment." 227 Kan. at 468.

After *Martin I*, the legislature enacted a different statute addressing the valuation of farm machinery and equipment. See *Martin III*, 230 Kan. 759. This statute defined the fair market value of farm machinery and equipment as its "average loan value" when new, less a deduction of 10 percent or 20 percent per year of age, depending upon whether the equipment was powered. 230 Kan. at 761. And when litigation ensued, the issue again was whether the statute violated art. 11, § 1.

After quoting extensively from *Martin I*, the *Martin III* court turned to the statute. It first examined the meaning of "average loan value." The court reviewed published guides to personal property values, including one specifically targeted to farm machinery and equipment. It noted "average loan values" in the farm machinery guide were nearly

20

30 percent less than average resale prices and 15 percent less than average "as is" prices. The court concluded "average loan value, while having some correlation with fair market value, is not the price 'a well informed buyer is justified in paying and a well informed seller is justified in accepting.'" 230 Kan. at 767.

Then, the court noted the constitution requires a uniform and equal rate of assessment and does not exclude farm machinery from the requirement. It concluded the statute afforded unconstitutional differential treatment to farm machinery and equipment by fixing its initial value, arbitrarily, at average loan value, "without regard to the condition of the property or its sale value on the open market." 230 Kan. at 767. In comparison, it noted, all other tangible personal property was required to be valued according to K.S.A. 79-503 (Weeks 1977), the predecessor to K.S.A. 2014 Supp. 79-503a. 230 Kan. at 767. In addition, citing *Martin I*, the *Martin III* court reasoned the statute improperly shielded farm machinery and equipment from the effects of inflation. Under the statute, "neither inflation [nor] deflation is reflected in the appraisal of farm machinery and equipment . . . ." 230 Kan. at 768. The court concluded:

> "The legislature has attempted by [the statute] to grant tax relief by fixing a different, reduced, and discriminatory basis of assessment for certain property. The section thus violates the requirement of uniform and equal assessment mandated by Article 11, Section 1, of the Kansas Constitution. It creates an unlawful classification of personal property for ad valorem tax purposes." 230 Kan. at 769.

In *Martin II*, decided the same year as *Martin III*, the court considered yet another statute that altered the methodology for valuing taxable property—this time concerning the valuation of oil and gas wells and properties. The general rule required appraisers to consider the age of the wells, quantity and quality of oil or gas produced, nearness of the wells to market and market characteristics, the costs of operation, the probable life of the wells, and other facts affecting the property's value. The challenged statute provided that the value of working and royalty interests in a property that produced

21

"'oil or gas for the first time in economic quantities on *and* after July 1 of the calendar year preceding the year in which such property is first assessed shall be determined . . . by determining the quantity of oil or gas such property would have produced during the entire year preceding the year in which such property is first assessed upon the basis of the actual production in such year and by multiplying the income and expenses that would have been attributable to such property at such production level . . . by sixty percent . . . .'" 230 Kan. at 749.

The legislature adopted the provision to account for "flush production," in which new wells temporarily produce at a much greater rate than would be customary under ordinary circumstances. If used as a factor in determining value, that initial excessive production was "misleading and often result[ed] in excessive valuation and assessment for the initial year of taxation." 230 Kan. at 749.

The statute's opponents argued it resulted in differential treatment of oil and gas properties, contrary to the uniform and equal clause of article 11, § 1. The court held the statute was constitutional. It noted "[t]his court has long recognized that the legislature may prescribe the manner in which certain property shall be appraised in order to arrive at fair market value." 230 Kan. at 755 (citing *Bank v. Geary County*, 102 Kan. 334, 170 P. 33 [1918]; *Hunt v. Allen County*, 82 Kan. 824, 109 P. 106 [1910]; and *Francis, Treas., v. A. T. & S. F. Rld. Co.*, 19 Kan. 303 [1877]). It reasoned that the challenged provision

"merely adds one more factor to the other statutory factors to be utilized in determining the fair market value when the property is subject to the misleading phenomena of flush production. As such it is merely one element to be used in certain cases to assure that the lease or property is more nearly appraised at fair market value the same as other leases or properties which have an actual production history which may be relied upon in making the determination." *Martin II*, 230 Kan. at 755.

22

Discussing K.S.A. 79-503 (Weeks 1977), the predecessor to K.S.A. 79-503a, the court said the statute provided a list of criteria to consider in arriving at fair market value, the objective of which was to guide the appraiser in arriving at that figure. It characterized the challenged statute as criteria other than those set out in K.S.A. 79-503 (Weeks 1977) to arrive at the same figure, oil and gas property "[b]eing unique from the ordinary type of personal property." 230 Kan. at 755. But it noted:

"The objective under both statutes is to reach the actual fair market value in the market place as opposed to a fictional, unrealistic, or arbitrary determination as was attempted in [the statutes challenged in *Martin I* and *Martin III*], wherein special treatment was given to the valuation of farm machinery which bore no reasonable relationship to the actual fair market value of the machinery. The statute here in question was adopted to furnish criteria to be utilized in appraising a certain category of property because the general criteria . . . were not applicable. However, the goal of [the statute] is the same, that is, to arrive at the actual fair market value of the property appraised." 230 Kan. at 755-56.

Respondents do not favor the court with a discussion of the *Martin* cases, and instead couch their arguments in terms of equal protection based on later cases involving tax exemptions. They argue the constitutional test for compliance depends only on whether the legislature had a rational basis for the preferential tax treatment granted by the statute, citing the tax exemption case, *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981) (*Tomasic I*). Respondents argue the legislature was justified in giving more favorable valuation treatment to taxpayers who successfully lowered their property valuation in a tax appeal to recognize their expense in doing so and to prevent taxing districts from retaliation by increasing the valuation the next tax year. The legislative history suggests this indeed was a motivating policy concern when the legislature enacted K.S.A. 2014 Supp. 79-1460.

But tax exemptions are different than tax valuations. And, as summarized above, the tax valuation cases utilize a stricter test when interpreting the constitutional language at issue here.

Respondents acknowledged in oral arguments that to adopt their rational basis view we likely must overrule the *Martin* line of cases, as well as the cases upon which their holdings are based. Put another way, perhaps the more accurate statement is that respondents' reliance on *Tomasic I* to argue that we should apply a rational basis test suggests they believe the *Martin* cases were overruled. Either way, we conclude the tests are different because the constitutional requirements at issue are different.

In *Tomasic I*, the challenge was to the constitutionality of two different statutory schemes concerning development of an industrial-use facility for the General Motors Corporation. More specifically, the case challenged the legality of 10-year ad valorem property tax exemptions granted for the project's facilities and equipment purchased with revenue bond proceeds. Those exemptions were attacked under both Kansas Constitution article 11, § 1 and the Equal Protection Clause of the United States Constitution. Respondents seize on the following statement from *Tomasic I*:

> "Where constitutional challenges have been made to tax exemption schemes as violative of Article 11, Section 1, of the Kansas Constitution, this court has consistently held that the uniform and equal rate of assessment and taxation provision is, in principle and effect, substantially identical to the principle of equality embodied in the Equal Protection Clause of the United States Constitution." 230 Kan. at 426.

See also *State ex rel. Tomasic v. City of Kansas City*, 237 Kan. 572, 584, 701 P.2d 1314 (1985) (*Tomasic II*) (citing *Tomasic I*, 230 Kan. at 426).

In a case involving the taxation of intangible property and the exemption of such property from taxation, this court has characterized this statement as establishing that the

24

*Tomasic* court had "held article 11, § 1, is substantially identical to the principle of equality embodied in the Equal Protection Clause of the 14th Amendment." *Von Ruden v. Miller*, 231 Kan. 1, 10, 642 P.2d 91 (1982). But later in the same opinion, the *Von Ruden* court clarified that this statement was limited to "constitutional challenges . . . to tax exemption schemes." 231 Kan. at 13-14. And in a case concerning whether article 11, § 1 required that the personal property of an oil pipeline company be taxed as "public utility property" or as "commercial and industrial property," like the personal property of railroads, the court characterized this statement as holding "the protection granted by uniform and equal rate of assessment and taxation provision . . . is virtually identical to the protection granted under the Equal Protection Clause." *Colorado Interstate Gas Co. v. Beshears*, 271 Kan. 596, 609, 24 P.3d 113 (2001). We also note additional cases referenced in the parties' pleadings in which the language from *Tomasic I* has found its way into the court's article 11, § 1 analysis are in contexts other than property tax exemptions. See *In re Tax Appeal of City of Wichita*, 274 Kan. 915, 920, 59 P.3d 336 (2002) (sales tax assessment) (citing *Colorado Interstate Gas*, 271 Kan. at 609); *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 251-52, 930 P.2d 1 (1996) (income tax rates).

Respondents argue these authorities show the rational basis test used to assess whether discriminatory tax practices violate equal protection is applicable in our analysis of K.S.A. 2014 Supp. 79-1460. They are mistaken. We conclude some of the language from these cases may have been inartful to the extent it referred to article 11, § 1 in such sweeping terms without recognizing the provision's multiple purposes. But as the facts in these cases show, none concerned statutory differences in valuation methodologies such as the ones at issue in *Martin I*, *Martin II*, and *Martin III*.

*Tomasic I*, the decision from which the language in each of these cases cited by respondents emanates, is a property tax exemption case. And a property tax exemption is just that—an exemption from ad valorem taxation on the subject property. It does not represent a difference in a property's valuation methodology prior to the calculation of tax

25

liability as we have in the case brought by the Counties. We also observe that exemptions of private property must be based on the property's use, not the circumstances of its owner. *Topeka Cemetery Ass'n v. Schnellbacher*, 218 Kan. 39, 42, 542 P.2d 278 (1975).

It is important to recall that article 11, § 1 (2014 Supp.) has more to it than what has been quoted above. As to exemptions from taxation, it provides for specific exemptions. See § 1(b). It also gives the legislature authority to exempt from taxation certain types of property or property used for certain purposes. See §1(a) (recreational vehicles); see also art. 11, § 13(d) (property found to have a public purpose and promote the general welfare). None of the cases cited in the pleadings for this principle are applicable to the situation presented by K.S.A. 2014 Supp. 79-1460.

Notably, the portion of article 11, § 1 with which we are concerned today applies only to "property subject to taxation." Plainly, this excludes property that is not subject to taxation by reason of exemption. Faced with a choice between applying the *Martin* cases, which dealt with statutes of the same character as the one challenged here, or the language from *Tomasic I*, which by its own terms applies to tax exemption schemes, we must apply the *Martin* cases. Neither *Tomasic I* nor the later cases seizing on its language demonstrate that this court has made a deliberate, reasoned decision to construe the phrase "uniform and equal basis of valuation" as the respondents suggest—that is, to guarantee nothing more than that different bases of valuation will be permitted if a rational basis exists for the disparate treatment.

*K.S.A. 2014 Supp. 79-1460 is unconstitutional*

To determine whether the challenged statute violates the constitutional mandate, we begin by putting K.S.A. 2014 Supp. 79-1460 in context.

26

To provide the constitutionally required "uniform and equal basis of valuation," the legislature necessitates that "[e]ach parcel of real property shall be appraised at its fair market value in money, the value thereof to be determined by the appraiser from actual view and inspection of the property," K.S.A. 79-501; see K.S.A. 79-411; "or from statistical methods prescribed by the director of property valuation, from consultation with the owner or agent thereof if expedient and from such other sources of information as are within the appraiser's reach . . . ." K.S.A. 79-411; see *Martin I*, 227 Kan. at 458, 462 (characterizing statute requiring valuation at fair market value as a "response to the constitutional command to provide for a uniform and equal rate of assessment and taxation"). In other words, the "basis of valuation" selected by the legislature is "fair market value." And in accordance with our express constitutional provisions, only land devoted to agricultural use is valued on a different basis. K.S.A. 79-501; Kan. Const. art. 11, § 1 (2014 Supp.); Kan. Const. art. 11, § 12.

The legislature has defined "fair market value" as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." K.S.A. 2014 Supp.) 79-503a. The appraisal process "shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 2014 Supp. 79-503a. In determining fair market value,

"Sales in and of themselves shall not be the sole criteria . . . but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

28

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes." K.S.A. 2014 Supp. 79-503a.

As can be readily seen, all real property, other than agricultural use property, is valued in the same way every year. K.S.A. 2014 Supp. 79-1460 provides the exception. As quoted above, it requires that the valuation of real property shall not be increased for the next 2 taxable years following the taxable year that the property's valuation has been reduced due to a final determination made pursuant to the valuation appeals process unless "documented substantial and compelling reasons exist." Those reasons are statutorily restricted to a change in the character of the property's use or a substantial addition or improvement to the property. K.S.A. 2014 Supp. 79-1460(c)(1).

By strictly defining "substantial and compelling reasons" to mean "a change in the character of the use of the property or a substantial addition or improvement to the property" the legislature has made impossible any reasonable construction of the statute that would permit an increase in valuation based on the statutory fair market value criteria. Absent such a reason, property subject to the appeal statute is valued at its prior fair market value as of January 1 for the next 2 years, while all other property is appraised at its fair market value as of January 1 of the current year. Clearly, the statute's plain language is targeted at the affected property's valuation but not in a way related to the property's fair market value in the current year of appraisal.

Respondents argue that K.S.A. 2014 Supp. 79-1460 does not diminish appraisers' obligation to value property at its fair market value, and that it would be reasonable to interpret the statute as providing simply another factor to be considered when determining fair market value in the tax years following an appeal. This argument echoes, though it does not rely upon, the rationale for upholding the oil and gas well valuation statute in *Martin II*. But that case is distinguishable.

29

The statute in *Martin II* did not restrict appraisers' use of the factors employed to determine the fair market value for new oil and gas well properties. It merely governed the manner in which just one of those factors was used. Moreover, the manner prescribed by the legislature was related to determining the fair market value of the property because it was designed to ameliorate the "misleading phenomena of flush production" when valuing the property. See *Martin II*, 230 Kan. at 755. *Martin II* also observed the unique factors used to value oil and gas well properties were necessary based on the exceptional attributes of those properties that rendered the ordinary factors inappropriate.

In contrast, K.S.A. 2014 Supp. 79-1460(a)(2) and (c) restrict appraisers to just two factors that may justify increasing the value of property subject to the statute. Here, nothing other than the fact that the property's valuation was successfully appealed is offered to explain why property covered by the statute escapes ordinary valuation under K.S.A. 2014 Supp. 79-503a. Nothing suggests some unique quality of the property for which the valuation has been appealed renders all the factors in K.S.A. 2014 Supp. 79-503a irrelevant for the next 2 tax years in determining the property's value. In other words, K.S.A. 2014 Supp. 79-1460 does not simply require appraisers to ask whether a property's fair market value remains the same in the 2 years following a successful tax appeal—the statute actually answers that question and forbids any subsequent valuation increase.

The Kansas Constitution is explicit. The legislature "shall provide for a uniform and equal basis of valuation . . . of *all property subject to taxation*." (Emphasis added.) Kan. Const. art. 11, § 1 (2014 Supp.). While most taxable property is valued at its fair market value in the current tax year, K.S.A. 2014 Supp. 79-1460 provides that one group of taxpayers' real estate will not be valued higher than the prior year's value. The statute was enacted solely to give preferential treatment to those who have successfully exited the appeal process. Its effect is to lessen the tax burdens for some based on the results of

30

their tax appeals, while at the same time shifting their reduced tax burden to other properties. Nothing suggests this differential treatment is calculated to ensure the property subject to the statute is valued in a tax year on the same basis as other taxable property, *i.e.*, at its actual fair market value in the relevant tax year. Instead, it prevents appraisers from considering relevant valuation factors when fixing the taxable value of the property in the 2 years following a successful appeal.

We hold K.S.A. 2014 Supp. 79-1460 violates article 11, § 1 of the Kansas Constitution by establishing conditions under which county appraisers must not value a property on the same basis as all other property. The requirement set out in our constitution for a "uniform and equal basis of valuation and rate of taxation" establishes a limitation on the legislature's power when arriving at a system for ad valorem taxation. See *Wheeler v. Weightman*, 96 Kan. 50, 58, 149 P. 977 (1915). So while the policy goals meant to be realized by the statute's enactment may have merit, the manner chosen by the legislature to realize those goals runs counter to the constitutional limitation. See *District of Columbia v. Heller*, 554 U.S. 570, 636, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) ("The Constitution leaves the District of Columbia a variety of tools for combating [handgun violence], including some measures regulating handguns [citations omitted]. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.").

THE UNCONSTITUTIONAL PROVISIONS ARE SEVERABLE

Respondents alternatively argue that, if the court holds K.S.A. 2014 Supp. 79-1460(a)(2) and (c) unconstitutional, these provisions should be severed from the statute, so the remainder may stay in force. The Counties agree. Respondents go on to note that K.S.A. 79-1484 provides: "If any sentence, clause, subsection or section of this act is held unconstitutional or invalid by any court of competent jurisdiction, it shall be

31

conclusively presumed that the legislature would have enacted the remainder of the act not so held unconstitutional or invalid."

"On several previous occasions, this court has considered severing a provision from a statute if to do so would make the statute constitutional and the remaining provisions could fulfill the purpose of the statute." *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 913, 179 P.3d 366 (2008). Whether a provision may be severed depends on the legislature's intent. The court assumes severability if the unconstitutional portion of a statute can be severed """without doing violence to legislative intent.""" 285 Kan. at 913. """If from examination of a statute it can be said that the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand.""" *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 317, 955 P.2d 1136 (1998) (*Tomasic III*).

The portions of K.S.A. 2014 Supp. 79-1460 not challenged here or required to implement the challenged portions provide:  (1) the date on which the appraiser must notify taxpayers of the valuation assigned to his or her property; (2) that the value of real property shall not be increased unless the county appraiser has reviewed the latest physical inspection, and documentation, which is available to the taxpayer, exists to support the increase in valuation; (3) the definition of the term "taxpayer" as used in the statute; (4) the required contents of the valuation notice; (5) that failure to timely comply with the notice requirements does not invalidate a change in valuation; and (6) that the director of property valuation is to devise a guide to property tax appeals, to be provided on request to each taxpayer.

Items (1), (2), (3), (4), and (5) predate the challenged provisions, with minor changes made after the first provision instituting a "freeze" on increases in value after successful property appeals was enacted. See L. 1992 ch. 282, sec. 4. In addition, their

32

content is unrelated to the challenged provisions. Most of these subsections deal with the procedures applicable to distributing valuation notices. Item (2) prescribes a guideline for when appraisers may increase the value of real property, but the guideline applies generally to all property. It merely provides that the documentation supporting any increase in value must be available to the taxpayer. While item (6) was not enacted until 1999, its subject matter, too, is unrelated to the challenged provisions. L. 1999, ch. 123, sec. 4. These portions of K.S.A. 2014 Supp. 79-1460 are generally applicable. They are not related to the challenged provisions, are not required to implement the challenged provisions, and the challenged provisions are not required to implement them.

In short, the challenged portions of the statute are "discrete provision[s] of the Act that can be severed from the Act without doing violence to the basic statutory scheme." *Tomasic III*, 264 Kan. at 317. It does not appear the legislature would have intended the entire statute to fall without the challenged provisions. We hold subsections (a)(2) and (c) may be severed from K.S.A. 2014 Supp. 79-1460, so that the remainder of the statute remains effective.

The writ of mandamus is issued and relief ordered to preclude respondents from further efforts to implement the constitutionally offending statutory provisions.

* * *

STEGALL, J., dissenting: I dissent for two reasons: first, the majority applies the wrong test; and second, even applying the majority's newly fashioned test, the Counties cannot demonstrate the unconstitutionality of K.S.A. 2014 Supp. 79-1460. Before discussing each of these flaws in today's decision, I first provide a short overview of the history and purpose of K.S.A. 2014 Supp. 79-1460.

33

THE HISTORY AND PURPOSE OF K.S.A. 2014 SUPP. 79-1460

The challenged portions of K.S.A. 2014 Supp. 79-1460 together form a remedial measure designed to ensure the overall fairness and equality of an uncertain tax valuation process that is undeniably vulnerable to abuse. The majority's implicit characterization of these provisions as a "tax relief" measure granted to a preferred class of property owners (as were the statutes at issue in both *Martin I* and *Martin III*, discussed in greater detail below) is simply wrong. This law does not grant anyone a straightforward tax benefit via a discount factor applied to his or her tax liability. Rather, it is a remedial measure designed to incentivize valuation reform across the property tax valuation system *as a whole* in order to arrive at a closer adherence to the legislature's mandate to value all property at its fair market value using statutory factors and methods. In this sense, the legislative objective in passing this measure was to improve the accuracy of the final tax burden across all property owners alike. This is a strikingly different purpose from the intent found to be "discriminatory" in both *Martin I* and *Martin III*. *State ex rel. Stephan v. Martin*, 227 Kan. 456, 467, 608 P.2d 880 (1980) (*Martin I*) (the purpose of the tax exemption at issue was to "reduc[e] the property tax liability of some owners of farm machinery and equipment"); *State ex rel. Stephan v. Martin*, 230 Kan. 759, 769, 641 P.2d 1020 (1982) (*Martin III*) (the purpose of the tax exemption at issue was to "grant tax relief by fixing a different, reduced, and discriminatory basis of assessment for certain property").

The legislative history found in the 2013 legislative hearings on H.B. 2134—which would eventually become the now challenged subsections of K.S.A. 2014 Supp. 79-1460—indicates that the legislature had before it evidence of significant valuation abuse by county taxing authorities in Kansas and that the law was intended as a remedial measure to curb such abuse in the future. For example, the legislature heard that between 1997 and 2011 the aggregate property tax revenue in Kansas had increased from $1.97

34

billion to $3.9 billion. This near doubling in 14 years amounted to "nearly triple the rate of inflation, ten times the rate of mill levy increases and nearly nine times [the rate] of population growth." Testimony of Luke Bell, Kansas Association of Realtors, House Committee on Taxation, March 6, 2013. Given that the legislature heard that property tax revenue growth far exceeded the growth in both population and the aggregate tax rate, the explanation for the increase could only be either (1) a dramatic and sustained spike in fair market property values vastly disproportionate to the overall rate of inflation, or (2) a systemic problem of over-valuation of property by county taxing authorities in Kansas.

It appears the legislature heard and considered evidence tending to point to the second of these two possibilities. For example, the legislature was presented with an empirical study of all the approximately 18,000 tax appeals in the Court of Tax Appeals between 2006 and 2008. The study concluded that in 65 percent of those appeals, the taxpayer was awarded relief from excessive valuation. See Testimony of James Franko, Kansas Policy Institute, House Committee on Taxation, March 6, 2013. Finally, the legislature heard the testimony of the representative of the Kansas Association of Realtors "advocating on behalf of the state's 700,000 homeowners" that "county appraisers" disregard tax appeal findings by "simply increas[ing] the proposed valuation of the subject property back to the originally proposed amount that was the subject of the appeal in the next taxable year following the successful appeal." Testimony of Luke Bell, Kansas Association of Realtors, House Committee on Taxation, March 6, 2013.

In 2014, during the following legislative session, H.B. 2134 was amended into H.B. 2614, which in turn was amended into House Substitute for S.B. 231 and was eventually passed by the Kansas House by a vote of 124-0 and by the Kansas Senate by a vote of 26-13. Minutes, House Committee on Taxation, February 25, 2014, March 13, 2014; House J. 2014, p. 2923; Sen J. 2014, p. 2873. Given this legislative history, it is reasonable to conclude that the legislature overwhelmingly favored fixing, or at least

35

remediating, a problem of excessive valuation that had become systemic in our property taxation scheme.

CHALLENGES UNDER ARTICLE 11, § 1 OF THE KANSAS CONSTITUTION SHOULD BE REVIEWED USING THE RATIONAL BASIS TEST

When the Counties petitioned this court for a writ of mandamus, they began by declaring that the "tax exemption" contained in K.S.A. 2014 Supp. 79-1460 "does not meet the rational basis test." After we ordered briefing on the Counties' petition, they responded by saying "[i]t is not denied that the rational basis test applies." When discussing the merits of their claim, the remainder of the Counties' filings in this case are spent exclusively arguing that "there is no rational basis for" K.S.A. 2014 Supp. 79-1460.

This should come as no surprise given that this court has a long history—extending back at least to 1942—of applying a rational basis test to challenges arising under article 11, § 1 of the Kansas Constitution. This is because it has long been axiomatic and "safe to say [that] the equal protection clause of the federal constitution and state constitutional provisions pertaining to equality and uniformity of taxation are substantially similar and that, in general, what violates one will contravene the other and vice versa." *Associated Rly. Equipment Owners v. Wilson*, 167 Kan. 608, 617, 208 P.2d 604 (1949) (citing 51 Am. Jur., Taxation § 169). We have consistently repeated this principle across a wide spectrum of tax cases over the course of decades. See, *e.g.*, *Colorado Interstate Gas Co. v. Beshears*, 271 Kan. 596, 609, 24 P.3d 113 (2001) (stating that "[w]e have held that the protection granted by uniform and equal rate of assessment and taxation provision found in Article 11, § 1 of the Kansas Constitution is virtually identical to the protection granted under the Equal Protection Clause" in the context of a challenge to preferential tax treatment granted to railroads but denied to pipeline companies); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981) (*Tomasic I*) (stating that "[w]here constitutional challenges

36

have been made to tax exemption schemes as violative of Article 11, Section 1, of the Kansas Constitution, this court has consistently held that the uniform and equal rate of assessment and taxation provision is, in principle and effect, substantially identical to the principle of equality embodied in the Equal Protection Clause of the United States Constitution" in the context of a challenge to the Kansas Port Authority Act's tax exemption provisions for industrial-use facilities financed by local revenue bonds); *Topeka Cemetery Ass'n v. Schnellbacher*, 218 Kan. 39, 43, 542 P.2d 278 (1975) (stating "the equal protection clause of the federal constitution and state constitutional provisions pertaining to equality and uniformity of taxation are substantially similar and that, in general, what violates one will contravene the other and vice versa" in the context of a challenge to a statute exempting from taxation cemetery land owned by individuals for use as grave sites while not exempting cemetery lands owned by corporations).

In 1942 we explained why we have traditionally applied a rational basis test to claims that a tax measure abrogates the rights and interests protected by the principles of equal protection which form the gravamen of article 11, § 1 of our constitution.

> "'A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it.'" *Natural Gas Pipe Line Co. v. Commission of Revenue and Taxation*, 155 Kan. 416, 422, 125 P.2d 397 (1942) (quoting *Carmichael v. Southern Coal Co.*, 301 U.S. 495, 509, 57 S. Ct. 868, 81 L. Ed. 1245 [1937]).

"'Not discrimination as such but only unreasonable and arbitrary discriminations are prohibited by state and federal constitutions.'" *Natural Gas*, 155 Kan. at 423 (quoting *St. Louis Union Trust Co. v. State of Missouri*, 348 Mo. 725, Syl. ¶ 3, 155 S.W.2d 107 [1941]).

37

While *Natural Gas* was primarily an income tax case, the legal test was clearly established that when the Kansas Constitution demands that taxation of all types be "equal and uniform," it is not prohibiting every single deviation from absolute uniformity, but only those discriminations that are "unreasonable and arbitrary." In the years since *Natural Gas*, we have repeatedly applied this rational basis test to property tax challenges arising under article 11, § 1. See, *e.g.*, *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 622-24, 78 P.3d 419 (2003) (applying rational basis to argument that the Board of Tax Appeals interpretation of the law resulted in "unequal treatment [that] violates the uniform and equal rate of assessment and taxation clause of article 11, § 1 of the Kansas Constitution"); *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 302, 891 P.2d 445 (1995) (applying rational basis review to article 11, § 1 challenge to tax exemption for unreported property); *State ex rel. Tomasic v. City of Kansas City*, 237 Kan. 572, 578-79, 701 P.2d 1314 (1985) (*Tomasic II*) (applying rational basis review to article 11, § 1 challenge to statutory exemption from property taxes); *Von Ruden v. Miller*, 231 Kan. 1, 10, 642 P.2d 91 (1982) (equal protection and article 11, § 1 challenge); *Tomasic I*, 230 Kan. at 412, 426 (applying rational basis review to constitutional challenges to law authorizing tax exemption under Equal Protection Clause and article 11, § 1); *Topeka Cemetery Ass'n*, 218 Kan. at 43 (article 11, § 1 challenge); *State, ex rel., v. Board of Regents*, 167 Kan. 587, 596-97, 207 P.2d 373 (1949) (applying rational basis review to article 11, § 1 challenge to exemption of revenue bonds from taxation); *Hartman v. State Commission of Revenue and Taxation*, 164 Kan. 67, 70-71, 187 P.2d 939 (1947) (equal protection and article 11, § 1 challenge); *State, ex rel., v. State Commission of Revenue and Taxation*, 163 Kan. 240, 249, 181 P.2d 532 (1947) (constitutional challenge to tax laws under the Equal Protection Clause and article 11, § 1).

In the face of these precedents, the majority today creates and applies a new test never before articulated. Namely, that when it comes to valuation, no deviations from absolute uniformity shall be tolerated, no matter how justified. The majority articulates

38

the rule that anything that prevents the valuation of "taxable real property at its actual fair market value in any tax year" is unconstitutional. Slip op., Syl. ¶ 6. This test is extrapolated from the three *Martin* cases. *Martin I*, 227 Kan. 456; *State ex rel. Stephan v. Martin*, 230 Kan. 747, 641 P.2d 1011 (1982) (*Martin II*); *Martin III*, 230 Kan. 759. The majority dismisses the precedential value of the decisions cited above on the grounds that they "inartful[ly]" referred to article 11, § 1 in the context of equal protection considerations and rational basis review with "sweeping terms." Slip op. at 25. This conclusion is supported by an effort to distinguish equality and uniformity in *valuation* from equality and uniformity in *taxation*. Similarly, the majority tries to distinguish today's statutory scheme, and the ones under consideration in the *Martin* cases, from the exemption schemes which were later judged using a rational basis test. See slip op. at 25-26. When we consider the purpose and function of article 11, § 1, however, (along with the actual language used by this court in the *Martin* line of cases) these distinctions are ephemeral.

First, valuation considered in a vacuum, without relation to the tax rate, has no constitutional weight or meaning. The constitutional purpose behind requiring a uniform and equal valuation is solely to arrive at a uniform and equal distribution of taxation. If, for example, the rate of taxation were zero, the valuations would be meaningless.

> "Uniformity in taxing implies equality in the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in the rate of taxation. . . .
> "It is apparent that uniformity is necessary in valuing property for assessment purposes so that the burden of taxation will be equal." *Addington v. Board of County Commissioners*, 191 Kan. 528, 531-32, 382 P.2d 315 (1963).

> "'Uniformity in taxing implies equality in the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in the rate of taxation.

39

"'. . . Uniformity of taxation does not permit a systematic, arbitrary or intentional valuation of the property of one or a few taxpayers at a substantially higher valuation than that placed on other property within the same taxing district; however, this uniformity and equality in a constitutional and statutory sense does not require mathematical exactitude in the assessment valuation of property for taxation. [Citations omitted.]'" *Beardmore v. Ling*, 203 Kan. 802, 806, 457 P.2d 117 (1969), *disapproved on other grounds by Gordon v. Hiett*, 214 Kan. 690, 697, 522 P.2d 942 (1974).

In short, article 11, § 1 "'prohibits all favoritism, requiring all to contribute in proportion to their means to the support of the public burdens.'" *Wheeler v. Weightman*, 96 Kan. 50, 54, 149 P. 977 (1915) (discussing purpose of article 11). Given these authorities, there is no sensible explanation for allowing the legislature some leeway from absolute equality—when supported by a rational basis—as it relates to the *final tax burden* borne by citizens, but *not* allowing the legislature *any* leeway when it comes to the *method of valuation*. Valuation is merely *one component* of the formula for arriving at the burden of taxation. It defies logic to impose a "uniform and equal" rubric of absolute rigor on one variable in an equation (valuation) but a more relaxed and deferential standard on the ultimate result of the equation (taxation).

Perhaps more significantly, the majority's efforts to shield the *Martin* holdings from the impact of this court's subsequent opinions concerning tax exemptions cannot survive a simple consideration of the language used in *Martin I*. The statutory scheme at issue there—a flat 20 percent reduction of value applied to certain property—was described as a "partial exemption" and was defined as: "'A law . . . omitting from assessment portions of any particular property, *thus lessening the estimate of its value, has the effect of exempting it to that extent from taxation*.'" 227 Kan. at 467 (quoting *Huntington v. Worthen*, 120 U.S. 97, 101, 7 S. Ct. 469, 30 L. Ed. 588 [1887]). A few years later, in *Tomasic II*, 237 Kan. at 579, this court heard another challenge to the constitutionality of a tax exemption statute and we gave a four-element test for the constitutionality of such exemptions:

40

"(1) whether the exemption furthers the public welfare, *State, ex rel., v. Board of Regents*, 167 Kan. 587, 207 P.2d 373 (1949); (2) whether the exemption provides a substantial, peculiar benefit, *Alpha Tau Omega v. Douglas County Comm'rs.*, 136 Kan. 675, 18 P.2d 573 (1933); (3) whether the exemption provides for large accumulations of tax-exempt property; and (4) whether the exemption is an improper or preferential classification of property, *State, ex rel., v. Board of Regents*, 167 Kan. 587."

These factors look a great deal like a rational basis test. And indeed, a review of *Martin I* suggests that the court was not, as the majority would have it, imposing a rule of strict compliance on the legislature. While the *Martin I* court does not explicitly say it was conducting a rational basis review (perhaps it was "inartful"), its reasoning, at least in part, partakes of elements of a rational basis test. For example, the *Martin I* court says that article 11, § 1 "prohibits favoritism" and thus, "the crucial inquiry is the legislative intent and purpose for enacting" the exemption. 227 Kan. 456, Syl. ¶ 10, 462. The court then analyzed the purpose of the exemption at hand and concluded that none of the legislature's reasons could "justify the discriminatory subclassification" of property. 227 Kan. at 467. The court explained:

"[T]he Court can take judicial knowledge of the fact that even though there has been an inflation of property values in recent years, the rate of inflation was not 15% in 1978, nor was it 20% in 1979. Thus, neither the fixed percentage rate reduction ordered by the provisions of 79-342, nor those of its predecessor, K.S.A. 1978 Supp. 79-342, can be justified on the basis of the inflation rate. Second, to shield certain property, that is, 'farm machinery and equipment,' from the effects of inflation, when inflation is affecting all property, is an act of discrimination, inconsistent with art. 11, § 1 of the Kansas Constitution." 227 Kan. at 467.

When viewed in the larger context of the history of this court's jurisprudence surrounding article 11, § 1, the *Martin I* treatment begins to look suspiciously like a rational basis review. But regardless, to the extent the *Martin* line of cases intended to

41

establish, and did establish, the rule the majority now applies, that line of cases was simply wrong and was overruled by our subsequent cases permitting property tax exemptions when rationally related to some legitimate public purpose. Applying the *Tomasic I* test, or any other version of a rational basis review, K.S.A. 2014 Supp. 79-1460 would pass constitutional muster. It is clearly an exemption from valuation during a limited 2-year period of time. It is clearly rationally related to a legitimate public purpose. It does not establish an arbitrary or discriminatory subclassification of property, and it cannot result in any large accumulation of exempt property.

EVEN APPLYING THE NEW TEST ARTICULATED BY THE MAJORITY, K.S.A. 2014 SUPP. 79-1460 IS CONSTITUTIONAL

Finally, I dissent because the majority misapplies its own newly created test. *Martin II* is the key case to understanding the rule the majority draws out of the entire *Martin* line. In *Martin II*, the court upheld a statutorily imposed flat 40 percent reduction in value applied to a certain subclass of property. 230 Kan. at 749, 758. How does such a scheme survive today's rule? Because, as described in *Martin II* and discussed in detail by the majority above, the 40 percent reduction in value was reasonably calculated to more nearly reflect the fair market value of the subclass of property when that subclass had been subject to erroneous over-valuations—in other words, when the partial exemption scheme was intended to be a remedial measure designed to "correct an error"—to use the words of *Martin I*. 227 Kan. at 465. We described the failure or refusal of "local assessors . . . to take into consideration the 'flush production' feature of new wells" and who thus "arrive[d] at [an] . . . excessive valuation and assessment." *Martin II*, 230 Kan. at 749. Due to these facts, "'[l]egislation was needed to correct the assessment practices in the State of Kansas which resulted in an over-assessment.'" 230 Kan. at 749. Thus, the partial exemption was "designed to ameliorate the 'misleading phenomena of flush production.'" Slip op. at 30 (quoting *Martin II*, 230 Kan. at 755).

42

But there should be no doubt that it would be reasonable for the legislature to conclude that the "phenomena" of valuation abuse by counties—when proven in a specific case with regard to specific real property—is likely to be just as (if not far more) "misleading" when it comes to subsequent valuations than the "flush production" phenomena at issue in *Martin II*. In that case, we determined that the legislature was constitutionally permitted to establish a downward valuation offset because the results of the ordinary and uniformly applicable valuation methods "often result[ed] in excessive valuation" when applied to a specific and clearly defined subclass of property—*i.e.*, new wells. *Martin II*, 230 Kan. at 749; see also slip op. at 22 (discussing same). Given the legislature's determination that the ordinary valuation process *lacked credibility* when applied to new wells, we held the legislature was justified in crafting a remedial offset measure designed to "more nearly" approximate the fair market value of that subclass of property. 230 Kan. at 755.

Here, the reasonableness of the legislature's remedial efforts is even further beyond reproach. Here, the legislature did not need to resort to generalities about a subclass of property that was "often" over-valued. The legislature crafted a remedial provision that *only* applies to a subclass of property that has been proven to have been over-valued. That is the very definition of the subclass of property at issue in this case. Given this demonstrated failure of the ordinary valuation methods to arrive at fair market value, the holding of *Martin II* strongly suggests that the legislature was justified in crafting a remedial measure designed to more nearly approximate the fair market value.

Stating it plainly, if it has been conclusively determined that property has been over-valued in tax year 1, which valuation is more likely to reflect the *true* fair market value of that same property in tax years 2 and 3: (1) the fair market value established in tax year one by a neutral and detached magistrate upon hearing and evaluating the evidence as presented by both parties; or (2) a re-valuation of the same property in tax

43

years 2 and 3 conducted by the party that was conclusively determined, by the neutral and detached magistrate, to have over-valued the property in tax year 1?

As a court, we need not decide the question one way or the other. We need only ask whether it is reasonable for the legislature to conclude as a matter of policy that the first option "more nearly" represents the fair market value of the subclass of property. This is because, as discussed, even applying the majority's preferred analytical rubric at work in *Martin II*, the legislature may dictate the various factors that go into a determination of fair market value even when those factors impact different subclasses of property differently—so long as those factors are reasonably calculated to "more nearly" reflect fair market value.

Given this, even were I to accept the majority's extrapolation of the *Martin* line of cases into a bright-line rule dictating that *any* legislative policy or command—even if narrowly tailored to further a compelling state interest—that "prevents . . . valuing taxable real property at its fair market value in any tax year" is unconstitutional, I could not conclude that K.S.A. 2014 Supp. 79-1460 violates article 11, § 1. Simply put, after resolving "all doubts . . . in favor of upholding" the law (as the majority claims it has done, see slip op. at 18), it is clear to me that the short, remedial, 2-year safe harbor accorded the subclass of property at issue here is reasonably calculated to more nearly arrive at the actual fair market value of that property during tax years 2 and 3 than would the alternative method of permitting a proven bad actor to re-value the property each year.

With respect to this narrow subclass of property, the legislature has essentially put the county valuation expert in a 2-year "time out" in response to his or her proven lack of credibility. In the absence of a reliable, yearly valuation established by methods that are ordinarily credible, the legislature has reasonably concluded that the best remaining

44

measure of fair market value during the 2-year safe harbor period is the fair market value from tax year 1 as determined by the neutral and detached arbiter of the appellate process.

## THE ECONOMIC CONCLUSIONS DRAWN BY THE MAJORITY ARE FAULTY

As a concluding matter, a cautionary word seems appropriate concerning the majority's faulty analysis of the economic impact of K.S.A. 2014 Supp. 79-1460. The majority insists that "all property taxpayers who are not the beneficiaries of the statute's preferential 2-year fixed valuations are adversely impacted." Slip op. at 10. While it is beyond the scope of this dissent to conduct a thorough economic analysis of the impact of K.S.A. 2014 Supp. 79-1460 on taxpayers who do not fall within the 2-year safe harbor, the majority's assumption that all of these taxpayers are adversely impacted is questionable. The majority's economic analysis, to the extent it exists at all, is premised on reductive zero-sum assumptions which dictate that any benefit conferred on one economic actor must by necessity have been taken from some other actor.

But a substantial body of academic literature has demonstrated that dynamic, as opposed to static, economic modelling more accurately reflects reality, especially when it comes to understanding the impact of legal rules on future outcomes. See generally Posner, Economic Analysis of Law (9th ed. 2014). "Instead of after-the-fact static analysis of the distributional consequences of a [rule]," we ought to consider "the dynamic consequences of today's [rule] on future economic actors." Butler, Drahozal & Shepherd, Economic Analysis for Lawyers 33 (3d ed. 2014). Simply put, incentives matter. And not just in the private marketplace. Public choice theorists have shown that "political decision makers behave just like consumers and businesses. . . . They are constantly looking to exploit opportunities for gain within the political system." Butler, Drahozal & Shepherd, Economic Analysis for Lawyers 130.

One of the surprising and sometimes counterintuitive insights judicial decision makers should draw from the law and economics school is that what may sometimes appear to be the most "fair" result is, in actuality, the result which may perpetuate the conditions giving rise to the perceived inequities in the first instance. Judges tend to view cases from the ex post, after-the-fact perspective given that "[t]he nature of litigation invites judges to treat the parties' circumstances as fixed and to apportion gains and losses." Easterbrook, *The Supreme Court, 1983 Term, Foreward: The Court and the Economic System*, 98 Harv. L. Rev. 4, 10 (1984). Moreover, judges "who see economic transactions as zero-sum games are likely to favor 'fair' divisions of the gains and losses." Easterbrook, at 12. When considering the economic impact of different legal rules, however, it is better for a judge to take the ex ante, forward-looking perspective. Then, in any specific case, "if legal rules can create larger gains (or larger losses), the claim from fairness becomes weaker. The judge will pay less attention to today's unfortunates and more attention to the affects of rules." Easterbrook, at 12. Which perspective judges choose to take, then, "will depend, in part, on the extent to which they appreciate how the economic system creates new gains and losses; those who lack this appreciation will favor 'fair' treatment of the parties." Easterbrook, at 12.

The point Professor (now Judge) Easterbrook drives home is that the result that is "fair" from an ex post perspective may in fact be the most costly rule, resulting in the perpetuation of larger, systemic inequities or mal-distributions. In the case of legal rules of deterrence, the economic impact of changes in future behavior that arise in response to incentives may end up outweighing the costs of imposing the rule in any specific case. All economically efficient legal rules of deterrence work this way. Such rules exist and are economically beneficial to everyone when "the marginal cost of enforcement"—in this case the very slight differences in assessed value that may accrue between two groups of taxpayers in tax years 2 and 3—is balanced or outweighed by the "reduction in harm that results from enforcement"—in this case the benefit that accrues to all taxpayers when they avoid over-valuation in tax year 1. Butler, Drahozal & Shepherd, Economic

46

Analysis for Lawyers 393. As Professor Coase wrote in his seminal article "The Problem of Social Cost":

> "What has to be decided is whether the gain from preventing the harm is greater than the loss which would be suffered elsewhere as a result of stopping the action which produces the harm. In a world in which there are costs of rearranging the rights established by the legal system, the courts . . . are . . . making a decision on the economic problem and determining how resources are to be employed." Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1, 27 (1960).

So while the analytical tools provided by the law and economics school do not have a direct bearing on the constitutional questions posed in this case, they do cast an unhappy shadow on the sunny optimism animating the majority's preferred outcome. In other words, the majority's hope that today's decision will be an economic boon for taxpayers across the system is almost certainly misplaced.

For these reasons, I dissent.

ROSEN, J., joins in part the foregoing dissenting opinion: With the exception of the economic conclusion, I join Justice Stegall's dissenting opinion finding K.S.A. 2014 Supp. 79-1460 constitutional. I find the dissenting opinion compelling in its analysis of the standard of review and the rational basis that supports the legislative scheme. The majority fails to state a standard of review but apparently adopts a zero-tolerance standard for evaluating constitutional issues, which I find inappropriate in a case such as this. I take exception only with Justice Stegall's digression into economic theory, which is an issue not before us in this case. While legal scholars and academic literature have both vigorously denounced and rebutted the virtues of Law and Economic Theory, any inclusion presuming its validity is superfluous. In this case, as Justice Stegall himself points out, such inclusion does "not have a direct bearing on the constitutional questions posed in this case" (slip op. at 47) and is unnecessary to the finding of constitutionality.